UNITED STATES of America ex rel. Evsey S. PETRUSHANSKY, a/k/a Peter Green, a fugitive from Justice of the United Mexican States, Relator-Appellant,

v.

Anthony R. MARASCO, United States Marshal for the Southern District of New York, Respondent-Appellee.

No. 80, Docket 28232.

United States Court of Appeals
Second Circuit.

Argued Oct. 17, 1963.

Decided Dec. 30, 1963.

Edwin Gold, Jamaica, N. Y. (Gold, Lazar & Cooper, Jamaica, N. Y., on the brief), for relator-appellant.

Victor Temkin, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, on the brief) (Andrew T. McEvoy, Jr., and Robert J. Geniesse, Asst. U. S. Attys., of counsel), for respondent-appellee.

Before MEDINA, HAYS and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge.

Evsey S. Petrushansky, relator-appellant herein, has been charged with the crime of murder by the United Mexican States, which demanded his extradition in accordance with the Treaty of 1899 between the United States and Mexico. 31 Stat. 1818. A complaint charging him with murder in Mexico was filed with Commissioner Gerrity of the Southern District of New York on October 5, 1962 and a warrant for his arrest issued thereon. Pursuant to 18 U.S.C. § 3184, he was brought before Commissioner Bishopp for a hearing on December 3,

1962. After hearings on five dates in December 1962 and January 1963, the Commissioner found that Petrushansky was the person sought by the Mexican government, that the crime charged was an offense under the laws of both sovereignties and was extraditable under the treaty and that the evidence presented at the hearing, consisting of documents furnished by Mexico, was sufficient to establish probable cause to believe that Petrushansky committed the offense in that country. He remanded the fugitive to the custody of the United States Marshal to await the order of the Secretary of State. Relator then obtained a writ of habeas corpus from Judge Bonsal, on which argument was held before Judge Noonan. This appeal is taken from Judge Noonan's order discharging the writ.

Appellant argues here the same points which he raised before Judge Noonan. He claims first that the warrant for his arrest was invalid, because the complaint on which it was based was made by an Assistant United States Attorney having no personal knowledge of the facts and because it failed to specify any of the details of the crime charged. Second, he asserts that the evidence before the Commissioner was inadequate to establish probable cause that any extraditable crime was committed or that he was in any way connected with the crime. Finally, he alleges that the Commissioner erred in excluding proffered testimony that the supposed victim was alive at a time when the fugitive had already left the jurisdiction of Mexico. We shall discuss these points *seriatim*.

■ The authority of an Assistant United States Attorney to institute proceedings pursuant to a request for extradition was confirmed, as Judge Noonan explained, in Fernandez v. Phillips, 268 U.S. 311, 45 S.Ct. 541, 69 L.Ed. 970 (1925), which is controlling here. The fact that the complainant lacked personal knowledge of the facts is thus irrelevant. Appellant's position regarding the sufficiency of the complaint itself seems stronger, since it is limited to a statement that he is accused of murder and does not specify either the victim, the time and place, or the details. However, under Article X of the Treaty, each government is obligated, upon being notified by the other that it has issued a warrant of arrest, to procure the provisional arrest of fugitives and to detain them until supporting papers are received. This language appears to contemplate the issuance of warrants based on no more information than was provided here. Cf. Ex parte Dinehart, 188 F. 858 (C.C.S.D.N.Y.1911), where the court held that a complaint which, like this one, merely charged the offense of murder without supporting details, was sufficient to give the Commissioner jurisdiction to issue a warrant and conduct an evidentiary hearing.

■ Furthermore, no prejudice to the appellant appears to have resulted from the failure to set forth the details of the crime more clearly, since his counsel was fully acquainted with the evidence at the time of the hearing and was prepared to establish an alibi. Thus the appellant's attacks on the Commissioner's jurisdiction are unfounded. Cf. Yordi v. Nolte, 215 U.S. 227 (1909); Ex parte Sternaman, 77 F. 595 (N.D.N.Y.1896), aff'd sub nom. Sternaman v. Peck, 226 C.C.A. 214, 80 F. 883 (1897).

■■ Passing now to the sufficiency of the evidence adduced at the hearing to justify appellant's detention, it is necessary to deal with several points. First, appellant claims that the evidence was deficient for failure to include an authenticated copy of the Mexican law under which he is charged. This is required under Article VIII of the Treaty, but only with regard to those offenses in which it is specified in Article II that surrender shall depend on the fact of the crime being punishable under the laws of both parties. However, the proviso plainly applies only to the crimes of embezzlement from private persons, obtaining property by extortion or false pretenses, and attempts to commit the enumerated crimes, not to murder and the other crimes mentioned in Article

II. Second, appellant relies on Article XIX of the Mexican Constitution, which states that no one may be detained for longer than three days unless a formal complaint showing the time, place and details is provided him. This provision of Mexican internal law is of course primarily for the courts of that country to interpret; our duty would seem limited to ensuring that the applicable provisions of the treaty and the governing American statutes are complied with. In any event, the record discloses a complete statement by the presiding judge who issued the order of arrest, of the circumstances of the crime and the presumptive responsibility of the four men, including appellant herein, charged with it (Gov't Ex. 2, 197–221). This would seem to satisfy the constitutional requirements of that country.

 The next question is whether the documentary evidence, properly authenticated in accordance with 18 U.S.C. § 3190, was sufficient to justify the Commissioner's finding of probable cause. Appellant claims that it is insufficient to establish either the fact of a crime within the jurisdiction of Mexico, or his participation in any crime. His argument on the first point is rather frivolous. On November 18, 1961, two Mexican highway patrolmen noticed blood-stained men's clothing lying by the side of the Mexico-Acapulco highway, in a district called Segundo Cantil. On inspection, personal effects apparently belonging to one Louis M. Vidal, Jr., of New York City, were also found, together with a key to Room 908 of the Continental Hilton Hotel in Mexico City, in which Mr. Vidal had stayed on the night of November 11. On November 22, other police officers discovered a corpse buried by the side of the road, three kilometers from the location of the clothing. The corpse was riddled with four bullet wounds in the head and neck regions. It was later identified by Mrs. Teresa Vidal as the body of her husband, Louis M. Vidal, Jr. who had arrived in Mexico City from New York on November 11. If there are other explanations for the death than murder in Mexico, they are not readily apparent.

The evidence connecting Petrushansky with the alleged murder, if not quite as compelling as the evidence of murder itself, was certainly sufficient to establish a finding of probable cause. The record before the Commissioner included a deposition of Luis deGaray Jaimes, a Mexican citizen who is one of the four men accused by the Mexican authorities of the murder, which relates that he met Vidal when the latter arrived in Mexico by air from New York on November 11. DeGaray was accompanied by one Joel David Kaplan, an American also accused of the murder, who was an officer of the New York company which controlled the Mexican firm for which he worked. Kaplan had arrived from San Antonio on November 9, together with two other men later identified as Petrushansky and one Harry Kopelson, alias Earl Scott, who is the fourth man charged with the murder. All three took rooms at the El Diplomatico Hotel, on the same floor. Some weeks before, according to deGaray's deposition, Kaplan had told him at a meeting in Houston, Texas, that he intended to come to Mexico with his partner (Vidal) and two other persons in connection with a business venture, and that the partner "was a very dangerous individual, with whom he had had serious differences in the past, and he had been informed through other channels that he planned to eliminate him; for this reason, he thought that the day was not far off where either of them would do it, that is to say, commit a murder between themselves."

On Friday, November 10, Kaplan asked deGaray to get him a car for use on the business trip which he planned to make. After meeting Vidal on Saturday, November 11, Kaplan and deGaray took him to the Continental Hilton Hotel, where Vidal checked in. Later that afternoon, deGaray brought a 1953 Buick owned by his uncle to Kaplan at the El Diplomatico, in accordance with the latter's request. According to deGaray's deposition, he then went to his office and stayed

there during the evening, falling asleep on a sofa.[1] He was awakened at 2:40 on Sunday morning by a telephone call from Kaplan, who told him that the loaned car had broken down and that he should pick it up that morning. When deGaray picked up the car, he saw holes in the window and blood stains on the front seat and door. Later that morning, he met Kaplan and asked him about the meaning of the blood stains; Kaplan answered that "it is not possible, I did wash them off myself" and refused further explanation. DeGaray later washed some of the blood stains from the Buick. He did not see Kaplan, Vidal or the other two men again.

Other depositions in the record are those of employees at the Continental Hilton, who state that Vidal was checked out about midnight on Sunday night by Kaplan and his luggage placed in a 1961 Corvair; by employees of the El Diplomatico Hotel, which indicate that Scott, Petrushansky and Kaplan were in and out of their rooms on Saturday night and, when they appeared, seemed to be nervous and high-strung. In addition, it appears in the record that a valise containing clothing belonging to Vidal was discovered on November 16 in the trunk of a blue Corvair which had been rented by Petrushansky on the early morning of Monday, November 13. He had taken that car in lieu of another, rented Sunday night, which he claimed was mechanically defective. The deposition of Nancy Hernandez, an employee of the rental agency, states that she found the car parked illegally at the airport on Tuesday, November 14, and removed it to the company's main lot. Later on that day, Petrushansky came to the Hertz office at the airport and asked Miss Hernandez about the car he had rented. When told it had been found at the airport, he expressed surprise, saying he had left it the night before on the lot of the Diplomatico Hotel and that it had disappeared. However, he had the key.

Petrushansky then paid the bill for the rental, and then asked if anything had been found in it, to which she responded in the negative. Petrushansky appeared nervous and troubled during the entire interview.

The last major item in the record is a deposition of Kaplan. He states that he came to Mexico to assist in some business negotiations between Petrushansky and Vidal, both of whom he knew, and met Scott only on November 9 in San Antonio when Petrushansky joined him. His story of their movements in Mexico up to the evening of November 11 generally accords with deGaray's deposition. The deposition continues that he went with Petrushansky and Scott to pick up Vidal at the Hilton in the late evening, driving in the borrowed Buick. They dropped him (Kaplan) off at a bar near the Diplomatico, and continued on their way. Petrushansky and Scott then returned about 3 a. m. and told him that "Vidal had not fulfilled his part of the deal and Scott had killed him." Scott was armed with a .38 caliber revolver. (A cartridge clip for .38 caliber bullets was found by police on the floor of the Buick.) Kaplan denied knowing where Vidal was buried. He let Petrushansky and Scott off at the hotel, tried to clean out the blood stains and then called deGaray. Kaplan states that he told deGaray that Scott had killed Vidal. When Petrushansky and Scott awakened on Sunday afternoon, the three agreed to pick up Vidal's belongings at the Hilton Hotel, which they did on Sunday night. Kaplan checked out Vidal and placed his suitcase in the trunk of the car Petrushansky had rented. Kaplan was then left at the Diplomatico and Vidal's belongings were disposed of in a way not known to him.

On the basis of the evidence summarized in the preceding paragraphs, ample justification exists for holding Petrushansky to answer the charge of Vidal's murder. To be sure, the actual shooting, insofar as anything is known about it,

1. This part of deGaray's deposition is contradicted by statements of the watchman and elevator operator of the building where he worked, which indicate that none of the offices were occupied after midnight.

appears to have been done by Scott, but Petrushansky is directly implicated in a number of ways. The appellant relies strongly on one item in the record not previously mentioned, a police laboratory report dated December 2, 1961 which states that the blood scrapings taken from the Buick were twelve to fifteen days old. On the basis of this, he argues that the crime could have been committed no earlier than November 17, at which time he had already left Mexico. The report does not state specifically that the test was made on the date mentioned. Even if it were, however, it would hardly be proper to give so much weight to this far from precise report to the exclusion of all the other evidence in the case. Nor does the fact that the dirt found in and about the car was of a different color from the dirt found in the vicinity of the grave, as shown by the laboratory report, have much weight to counter the case built up in many other ways.

■■ Finally, appellant complains of the Commissioner's exclusion of that testimony of two persons who claimed to have spoken with Vidal over the telephone on November 14. There is no force in this contention. Although at a hearing of this type, the fugitive has a right to introduce evidence, the right is limited to testimony which explains rather than contradicts the demanding country's proof, and its precise scope is largely in the Commissioner's discretion. See Collins v. Loisel, 259 U.S. 309, 42 S.Ct. 469, 66 L.Ed. 956 (1922); Charlton v. Kelly, 229 U.S. 447, 33 S.Ct. 945, 57 L. Ed. 1274 (1913); Desmond v. Eggers, 18 F.2d 503 (9 Cir.), motion to stay execution denied, 274 U.S. 722, 47 S.Ct. 657, 71 L.Ed. 1341 (1927). Except for the ambiguous laboratory report mentioned above, the evidence all points to the murder being committed in the early morning hours of November 12, 1961. Under the circumstances, there was no error in excluding the proffered testimony.

Since the warrant was properly issued, the offense charged was within the Treaty provisions, the appellant is the fugitive demanded by the Mexican government, evidence sufficient for a finding of probable cause was furnished, and no error was committed at the hearing, no ground for issuance of the writ of habeas corpus existed. Accordingly, the judgment is affirmed.