**UNITED STATES of America,**

v.

**Carmine AGNELLO, Defendant.**

**No. 00 CR 205 NG RML.**

United States District Court, E.D. New York.

June 7, 2000.

Jay Goldberg, P.C., Larry Bronson and Scott Leemon, Bronson & Leemon, New York City, for plaintiff.

AUSA's Bridget Rohde, Andrew Genser, Brooklyn, NY, for defendant.

### *OPINION AND ORDER*

GERSHON, District Judge.

On May 18, 2000, Magistrate Judge Robert M. Levy adhered to his previous finding, based on clear and convincing evidence, that defendant Carmine Agnello was a danger to others and to the community, but concluded that the defendant had now proposed conditions of release that afforded adequate assurance of safety. Magistrate Judge Levy therefore ordered Mr. Agnello to be released upon satisfaction of certain conditions. The government seeks review of Magistrate Judge Levy's release order, and the defendant seeks review of the condition of release requiring that a security guard be posted outside Mr. Agnello's home 24 hours a day to monitor and search visitors. Magistrate Judge Levy issued a temporary stay of the release, and I have issued several orders to continue the stay pending my determination of the matter. On this appeal, the parties have exchanged a series of letters with various attachments, and have submitted the transcripts of all of the proceedings related to Mr. Agnello's bail that occurred before Magistrate Judge Levy on six days (March 15, 16 and 17, April 7, and May 9 and 18, 2000) and earlier before Magistrate Judge Roanne L. Mann on two days (March 6 and 10, 2000). After re-

viewing the various submissions, and hearing oral presentations on June 1, 2000, I now set forth my findings and conclusions.

The Bail Reform Act authorizes pretrial detention upon the court's finding that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Although the government originally sought detention on grounds of both risk of flight and dangerousness, it has abandoned the former ground and does not challenge Magistrate Judge Levy's finding that the defendant is not a flight risk. Pretrial detention is authorized only when the defendant is accused of certain offenses, including crimes of violence as defined in the Bail Reform Act, 18 U.S.C. §§ 3142(f)(1), 3156(a)(4), or where there is a serious risk that the defendant will flee or obstruct or attempt to obstruct justice, 18 U.S.C. § 3142(f)(2). The indictment includes charges of RICO and RICO conspiracy, 18 U.S.C. § 1962(c) & (d), ten counts of violation of the Hobbs Act, 18 U.S.C. § 1951, and six counts of violations of 18 U.S.C. § 844(i) & (n) relating to conspiracy and attempts to damage property by fire. The indictment accuses Mr. Agnello of having participated in the commission of multiple offenses involving arson and extortion, which are crimes of violence within the meaning of the Bail Reform Act. See generally *United States v. Dillard*, 2000 WL 665547 (2d Cir. May 22, 2000). The defendant does not argue otherwise.

■ In determining whether there are conditions of release that will reasonably assure the safety of any other person and the community, the court is required by statute to consider information regarding: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). A finding of dangerousness must be supported by clear and convincing evidence. *United States v. Rodriguez*, 950 F.2d 85 (2d Cir.1991); 18 U.S.C. § 3142(f). However, that evidence may be supplied through proffers and hearsay information, and the rules of evidence do not apply. *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir.1995). A district judge's review of a magistrate judge's detention or release determination is *de novo*. *See United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985). Nevertheless, I have carefully considered the findings of Magistrate Judge Levy, who conducted hearings on six days and thoughtfully evaluated the testimony, other evidence, and the parties' arguments.

■ I agree with Magistrate Judge Levy's finding that the defendant presents a danger to other persons and the community, substantially for the reasons he stated on the record on March 17, 2000, based on the charges in the indictment as supplemented by the government proffers, and the evidence received at the hearing establishing the defendant's participation in multiple acts of obstruction and attempted obstruction of justice, namely, bribery of a juror in a prior case and attempts to locate and intimidate a witness in this case.

The indictment alleges that Mr. Agnello is a member of the Gambino organized crime family who controlled various automobile-related and scrap metal businesses and headed a crew that associated for the principal purpose of earning money through criminal activity, including extortion and arson, and which "furthered its criminal activities [through] the threatened and actual use of force, violence and fear" and by other means. The indictment alleges that Mr. Agnello committed and participated in the commission of multiple acts of conspiracy and attempted and actual extortion and arson, including attempted extortion of a scrap metal processing business and attempted arson of the premises of that business, extortion of metal shredding businesses, attempted arson of the

premises of a metal shredding business, attempted extortion of a stock brokerage firm, extortion involving a debt collection agency, and extortion of a distributor of sanitation trucks, as well as other offenses of a non-violent nature. If convicted, Mr. Agnello can be sentenced to up to 20 years imprisonment on each of multiple counts of racketeering, extortion and arson. In addition, the indictment seeks forfeiture of Mr. Agnello's interest in properties, including businesses and real property, or of his interest in substitute properties including an extensive listing of premises and real property at various locations, up to the value of twenty-one million dollars.

Some of the charges arise from the dealings of Mr. Agnello and codefendants with a police undercover business engaged in scrap metal processing called Stadium Scrap. The evidence proffered by the government before Magistrate Judge Levy of Mr. Agnello's guilt is strong. It included the proffered testimony of undercover police officers, a cooperating witness, videotapes and audiotapes. According to the proffers, after the undercover officers rebuffed demands by Mr. Agnello and a codefendant to sell their product to Mr. Agnello's company, Mr. Agnello arranged for an arsonist to burn down Stadium Scrap. After the arsonist was caught breaking into Stadium Scrap and agreed to cooperate, he recorded conversations with Mr. Agnello in which Mr. Agnello instructed the cooperating witness on the details of how to commit the arson, and when the first attempt resulted in only limited damage, Mr. Agnello discussed details for another attempt with the cooperating witness. The cooperating witness, who unknown to Mr. Agnello was now working with the police, set controlled fires and reported back to Mr. Agnello each time in conversations that were recorded. It was also proffered that the cooperating witness will testify to his having been hired and paid by Mr. Agnello in an earlier attempt to set fire to a metal recycling business in the Bronx that did not involve the undercover business.

Further, according to the indictment and government proffer, codefendant Joseph Burger, acting on Mr. Agnello's behalf, threatened an employee who was soliciting Mr. Agnello's customers in the metal recycling business with death or serious injury. The government proffer included that Mr. Agnello personally threatened a debt collector by advising him—truthfully—that he was John Gotti's son-in-law and then threatening to break the debt collector's fingers and put him in the trunk of a car; in addition, Mr. Agnello threatened to hit a stockbroker over the head with a hammer because Mr. Agnello believed that the broker owed him money in connection with a stock option transaction. The government further proffered that Mr. Agnello threatened to put employees of a distributor of sanitation trucks in the hospital after he learned that they had made a report to the police following a property dispute.

The defendant did not challenge the government's proffer as to the strength of the evidence except by arguing that some of the incidents proffered were merely the products of business disputes or dishonesty by the alleged "victims," but that explanation only heightens legitimate concerns for the safety of others posed by the defendant. Threats of violence like those alleged to have been made by the defendant cannot lawfully be used to resolve business disagreements. Given the evidence captured on tape of the defendant's willingness to resort to arson when his extortionate demands to the undercover business were rebuffed, the threats cannot be dismissed as mere puffery or jokes. Coupled with the evidence of obstruction of justice to which I will now turn, the picture emerges of a defendant ready to resort to intimidation and violence to achieve his objectives.

Apart from the strong evidence supporting the charges in the indictment, the incidents of actual or threatened obstruction of justice credited by Magistrate Judge

Levy, with whose findings I agree, give rise to grave concerns for the safety of potential witnesses and the integrity of judicial processes if the defendant is released. *See United States v. LaFontaine,* 210 F.3d 125, 134 (2d Cir.2000) ("obstruction of justice has been a traditional ground for pretrial detention by the courts, even prior to detention for dangerousness which was instituted by the Bail Reform Act of 1984"); *United States v. Gotti,* 794 F.2d 773, 779 (2d Cir.1986) (reaffirming "longstanding principle that pretrial detention does not offend due process when it is imposed to prevent a defendant from intimidating witnesses").

First, it is not disputed that in 1989, during the trial of Eugene Gotti, the defendant's uncle-in-law, before what was supposed to have been an anonymous jury, Mr. Agnello with others approached an alternate juror at the juror's home and Mr. Agnello advised the juror that he would be replacing a regular juror. When the alternate juror asked how the defendant knew that, he replied that he just knew, and offered the juror $25,000 to do "the right thing". The alternate in fact replaced a regular juror shortly thereafter, but was excused from the deliberations by the court after he reported that he had been approached. On this appeal, the government has submitted reports of FBI interviews of the juror in which the juror states that he had already been approached twice and had accepted payments of $400 and $4,000 before his visit from Mr. Agnello. The juror quotes Mr. Agnello as offering "another 25" after the trial is over, clearly signifying awareness of the prior payments. I reject the defendant's argument that this incident should be minimized because of its staleness. I do not agree with the characterization of the incident as

"stale", and a calculated perversion of the judicial process through bribery of a juror by a businessman in his late 20s cannot be equated with some youthful indiscretion that, after the passage of many years, sheds little light on the criminal propensities of an accused.[1]

Second, shortly after Mr. Agnello's release on bail in early February of this year on charges pending in New York State Supreme Court, Queens County, that to some extent are similar to those in this case, he attempted to locate the individual he had hired to commit arson, who had become a cooperating witness. Mr. Agnello visited businesses in the Willets Point area of Queens, where Stadium Scrap had operated, and sought assistance in finding the cooperating witness while he also collected receipts from companies that had done business with Stadium Scrap, purportedly to assist defense counsel in investigating state price-fixing allegations. The government introduced information at the hearing through the testimony of FBI Special Agent Janet Engle, who had spoken with police detectives, who had in turn received information from a police informant ("CI–1") who was considered highly reliable. CI–1 reported that Mr. Agnello enlisted the assistance of a "capo" (captain) in the Genovese organized crime family, "Tony Parkside," whose true name is Tony Federici, to locate the "snitch" who formerly lived with codefendant Mark Lomonaco, saying that this individual "had caused all these problems". Mr. Agnello, made threatening gestures while discussing the "snitch" with "Tony Parkside." Mr. Parkside promised to assist Mr. Agnello in finding the "snitch", stating that he "would get the word out to his people" to do that. In fact, the arsonist who be-

1. The defendant suggested that the government's proffer of information concerning the bribery of the juror could have been derived from immunized testimony the defendant gave before a grand jury investigating the incident, but withdrew that claim before me for purposes of this determination after the

government proffered further information and the defense examined certain grand jury minutes during the oral argument before me on June 1. The public was excluded from a small part of that proceeding which dealt with grand jury matters and that portion of the transcript is sealed.

came a cooperating witness formerly shared living quarters with Mr. Lomonaco.

Agent Engle had originally stated that there were two similar incidents witnessed by CI-1 concerning Mr. Agnello's attempt to find the cooperating witness, one with Parkside and one with someone else not identified, instead of the one meeting with Parkside. The government reported to Magistrate Judge Levy, after he had made his finding of dangerousness, that it had learned from Agent Engle that CI-1 witnessed Agnello meeting only one individual to locate the "snitch," that described above with Parkside. Magistrate Judge Levy adhered to his determination that the defendant was a danger to others and to the community. The initial error in reporting CI-1's information does not undermine its reliability concerning Mr. Agnello's efforts to locate and intimidate the cooperating witness. Mr. Agnello testified at the hearing before Magistrate Judge Levy and admitted that he had in fact visited various metal processing businesses in the Willets Point area to gather receipts (although he denied making any threats or gestures or even discussing the "snitch" with anyone), so his visits to businesses in the area as reported by informant information is undisputed. Magistrate Judge Levy by his findings implicitly discredited the defendant's claims of innocence with regard to his presence in the area. My own review confirms that the defendant's testimony as to the nature and purpose of his visits was evasive, inconsistent and implausible. I find no error in Magistrate Judge Levy's rejection of the defendant's testimony.

I have also considered the information presented by the defendant to Magistrate Judge Levy, after he made his finding of dangerousness, to controvert testimony that Mr. Agnello's gesture reported by CI-1 was an "Italian death gesture". I find that, in the context in which it was made, as understood by CI-1, the gesture was a threatening one to the safety of the cooperating witness.

Moreover, information concerning Mr. Agnello's efforts to locate and intimidate the cooperating witness by visiting businesses in the Willets Point area did not emanate from CI-1 alone. A separate source observed Mr. Agnello showing a photograph to an individual of four white males, including a heavyset man in his forties, stating that "this is the guy who fucked me up." The cooperating witness, in fact, is heavyset. Attorney Jeffrey Lichtman, who now represents Mr. Lomonaco, testified for defendant Carmine Agnello at the bail hearing and acknowledged that he had received from Mr. Agnello, and had retained, a photograph of several heavy white men, including an individual Mr. Agnello correctly identified as the cooperating witness. Mr. Agnello told Mr. Lichtman that, at the request of his attorney in the state case, Mr. Agnello was visiting certain businesses to gather information on the "price fixing allegation." Mr. Lichtman instructed Mr. Agnello to cease such activity, as it would be construed as an obstruction of justice and lead to the defendant's being remanded to custody.

Mr. Agnello admitted at the hearing that he had obtained the photograph from Mr. Lomonaco and brought it to Mr. Lichtman, but denied that he had ever taken it to Willets Point or shown it to anyone else. Magistrate Judge Levy, in finding that the incident described by this second source occurred, obviously disbelieved Mr. Agnello's testimony, and I adopt Magistrate Judge Levy's assessment. The confirmation by Mr. Lichtman and Mr. Agnello that the photograph described by the source existed and had been possessed by Mr. Agnello at the pertinent time, information not known to the government before the hearing, furnishes persuasive corroboration that the second source accurately reported the incident.

Furthermore, Mr. Agnello would not have shown that photograph at businesses in Willets Point to investigate price fixing. The cooperating witness in these events is

an arsonist who had been hired to burn down Stadium Scrap. Mr. Agnello's purpose in carrying and displaying the photograph of the cooperating witness plainly was not benign. As Magistrate Judge Levy found, Mr. Agnello's display of the photograph was part of his attempt to tamper with the witness.

Based on the foregoing information, I find that, as soon as Mr. Agnello was released from custody on the state charges, he embarked on a campaign to find and intimidate an important witness, in blatant violation of the conditions of his release on the state charges. *See Gotti*, 794 F.2d at 779 (defendant's recent conduct while released on bail in another proceeding is probative of "his motive, capacity and propensity to commit certain acts if free on bail"). That conduct, together with his earlier participation injury tampering, reveals the defendant's contempt for court requirements and the danger he poses to witnesses and to the integrity of the criminal justice process. Magistrate Judge Levy appropriately observed in his March 17 oral opinion, at p. 13: "When threats of violence are made after defendant has been released on bond that is a strong indication that a defendant will not be deterred from engaging in violent behavior by orders of a Court and when that's added to the allegation about the jury tampering in a prior case, that seems to present a pattern of calculated efforts to inhibit a prosecution either by force or by bribery, or by intimidating people and that subverts the criminal justice system." Mr. Agnello's false testimony before the Magistrate Judge further demonstrates his contempt for the judicial process and undermines his assertions that he would respect conditions of release. *See LaFontaine*, 210 F.3d at 134 (noting district court's consideration of "defendant's perjury to the court during the revocation hearing" as a factor favoring continued confinement).

I recognize the painstaking care taken by Magistrate Judge Levy before he eventually decided, after having rejected the defendant's original proposed package of conditions as "insignificant" in view of the danger (March 17, 2000 Tr. at p. 13), to allow the defendant's release on high bail with elaborate conditions of monitored house arrest, but I cannot accept that determination. As indicated above, the evidence reveals that the defendant is contemptuous of court processes, readily resorts to violence and intimidation to serve his own ends, and presents a clear danger to witnesses and to the integrity of these judicial proceedings. Indeed, Magistrate Judge Levy's insistence on extraordinary security measures clearly shows his lack of confidence that the defendant would voluntarily comply with bail conditions. Bail was set at an $18 million appearance bond, co-signed by eighteen sureties, and secured by property valued at $ 8 million, including property owned by defendant, his relatives and neighbors. If the bond were ordered forfeited for violation of any condition of release, Mr. Agnello and his family, his mother-in-law, and others would lose their homes. In addition, the release order requires home detention, electronic monitoring, video surveillance, a 24 hour guard posted outside the defendant's home, recording of telephone conversations, consent to random searches, restriction of visitors to an approved list, prohibition of cellular telephones or other communication devices, and other provisions.

These measures, albeit elaborate, do not assure the safety of other persons and the community in a manner remotely commensurate to pretrial detention in a government facility. Mr. Agnello lives in a very large house on four acres with a guest house, pool house, stables, and other facilities. Although he purportedly would be restricted to one portion of his house, his activities inside the house will not be observed, nor is it reasonable to believe that the defendant could not evade monitoring by obtaining access to communication devices and employing other methods to car-

ry on criminal activity and to endeavor to obstruct justice. A security guard posted outside, video cameras directed at the outside of the house, and monitoring of telephone lines cannot be relied upon without good faith compliance from the defendant. In light of his past behavior, and most strikingly his recent attempts to locate and intimidate a witness immediately upon his release on the related state charges, such good faith cannot be anticipated. The safety of witnesses and others, and the integrity of the trial, should not be jeopardized by measures that clearly fall short of the safety provided by pretrial detention. As Judge Glasser observed in rejecting a proposal for a defendant's house arrest on his farm 100 miles from New York City, with elaborate conditions, the proposal is "in essence, one which would elaborately replicate a detention facility without the confidence of security such a facility instills," *United States v. Gotti*, 776 F.Supp. 666, 672 (E.D.N.Y.1991), quoted with approval by the Second Circuit in *United States v. Orena*, 986 F.2d 628, 632–33 (2d Cir.1993), and *United States v. Millan*, 4 F.3d 1038, 1049 (2d Cir.1993). *Orena* and *Millan* reversed release orders that imposed elaborate conditions which the Second Circuit rejected because those conditions failed to eliminate the danger to the community and were considered inferior to detention in achieving the goals of the Bail Reform Act. And in its very recent decision in *LaFontaine*, 210 F.3d 125, 133–35, the court affirmed an order of pretrial detention of a defendant even though that defendant, unlike here, was "a white-collar criminal with no connection to the mob," but like Mr. Agnello, had attempted to tamper with witnesses (even though in a non-violent fashion) in direct violation of the conditions of her release and had made false statements to the court concerning her contacts with the witness. The proposed conditions of release rejected by the courts in *LaFontaine* included home confinement, electronic monitoring, phone tap, and relocation to Florida. See also *United States v. Grisanti*, 1992 WL 265932

(W.D.N.Y.1992), cited with approval in *La-Fontaine*, which held that, particularly where the defendant has previously violated release orders by contacting a witness, the defendant should be detained and that home detention with electronic monitoring and other conditions cannot be relied upon to protect witnesses from "a determined accused." *Id.* at *7.

The Second Circuit also has made it clear that, apart from that Court's skepticism that home confinement will adequately protect the community from sufficiently dangerous defendants under any conditions, such extraordinary measures are not contemplated by the Bail Reform Act. In *Orena*, after noting that community safety could be "assured only if the government provides trustworthy, trained staff to carry out the extensive monitoring of homes, telephones, and travel that would be necessary to ensure compliance with the conditions of bail," the Court observed that, if the defendant there was entitled to release, "every defendant of means would be entitled to release on similar conditions," imposing a burden on the government that, apart from considerations of cost and practicality, was not required by the Bail Reform Act. 986 F.2d at 633. Nor do I think a wealthy defendant is entitled to greater consideration in the making of a bail decision than a defendant of modest means. Just as Congress provided in the Bail Reform Act that the court "may not impose a financial condition that results in the pretrial detention of the person," 18 U.S.C. § 3142(c), Congress did not intend that a dangerous individual should be released because that individual was sufficiently affluent to be able to pay the cost of extravagant release conditions monitored by private security officers. *See United States v. Patriarca*, 948 F.2d 789, 796 (1st Cir.1991) (opinion of Senior Circuit Judge Hill of the 11th Circuit sitting by designation, concurring *dubitante*) ("The ability of the defendant to pay should have nothing to do with the decision as to whether pretrial release conditions

constitute the 'heroic measures beyond those which can fairly be said to have been within Congress's contemplation,' " quoting *United States v. Tortora*, 922 F.2d 880, 887 (1st Cir.1990)).

*Orena*'s concerns are not overcome by the defendant's offer to hire a private security company, no matter how reputable, to provide security guards, electronic surveillance and video surveillance, and to absorb the costs of doing so. The burden on the government remains substantial, despite the measures proposed by the defendant to lessen that burden. Government personnel must still review the surveillance tapes and monitor the defendant's compliance with the conditions of his confinement. As the Second Circuit has instructed, such extraordinary burdens on government resources are not contemplated by the Bail Reform Act in order to allow an individual to be released who otherwise should be detained. Moreover, the protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility. Security guards are not trained to act as jailers or detectives, and a home is not a secure facility. A defendant who has demonstrated his unsuitability for pretrial release by actions calculated to subvert the criminal justice process should not be able to buy his way out by constructing a private jail, which cannot provide the same assurance of safety to the community that Congress sought to secure in the Bail Reform Act.

### Conclusion

In sum, I find by clear and convincing evidence that the defendant presents a danger to other persons and to the community, and that no conditions of release contemplated by the Bail Reform Act will reasonably assure the safety of other persons and the community. Carmine Agnello will be detained pending trial. The government's motion to revoke the release order is granted and, were it not now academic, I would deny the defendant's motion to amend, the conditions of his release.

**SO ORDERED.**