Pavel BORODIN, Petitioner,

v.

John ASHCROFT, as Attorney General
of the United States, Respondent.

No. 01 CV 1433.

United States District Court,
E.D. New York.

March 21, 2001.

Jacques Semmelman, Curtis Mallet–Prevost Colt & Mosle, New York City, T. Barry Kingham, Curtis Mallet–Prevost, Colt & Mosle LLP, New York City, for petitioner.

Loretta Lynch, United States Attorney, Eastern District of New York (Thomas Firestone, Assistant U.S. Attorney), Brooklyn, NY, for respondent.

## MEMORANDUM AND ORDER

NICKERSON, Judge.

Pavel Borodin petitions for issuance of a writ of habeas corpus under 28 U.S.C.

§ 2241, to be released from detention pending a hearing on a formal request for his extradition. Pursuant to Magistrate Judge Pohorelsky's provisional arrest warrant under 18 U.S.C. § 3184 and Article 13 of the Extradition Treaty between the United States and Switzerland, Borodin was arrested at Kennedy Airport en route to President Bush's inauguration on January 17, 2001 and has been detained at the Metropolitan Detention Center in Brooklyn. This petition comes before this court after bail was denied by Magistrate Judge Pohorelsky on January 25, 2001 and again on March 9, 2001.

Borodin is State Secretary of the Union of Russia and Belarus, a financial and trade union organized in January of 2000. Prior to January of 2000, he was Chief of the Administrative Directorate of the Russian Federation, overseeing construction of government buildings.

Magistrate Judge Pohorelsky's arrest warrant was issued on the basis of a warrant from a Swiss Examining Magistrate issued January 10, 2000. The Swiss government issued a "complementary" warrant on January 24, 2001, and a formal Extradition Request on February 5, 2001 seeking Borodin's extradition to face charges of money laundering and participation in a criminal organization in violation of the Swiss Criminal Code.

The formal request for extradition describes documentation amassed by the Swiss investigating magistrate in support of charges that Borodin exacted kickbacks in the range of $30,000,000 from Swiss companies for awarding them construction contracts in violation of Swiss Criminal Code Article 314, Dishonest Public Administration and Swiss Criminal Code Article 315, Passive Corruption.

Specifically, Borodin is alleged to have abused his position as head of the administrative directorate of the office of Presidential Affairs by awarding contracts for reconstruction of the Grand Palace of the Kremlin and the Accounting Chamber in Moscow to Mabetex Moscow, a subsidiary of the Swiss company Mabetex Project Engineering SA, through Borodin's associate Victor Stolpovskikh, and to the Swiss company Mercata Trading Company through Stolpovskikh and Andrei Siletskiy, Borodin's son-in-law. Large "commissions" were paid to companies connected with Borodin and his family and associates for each contract. Borodin is also alleged to have awarded contracts to Mercata for repair of the presidential airplane, and contracts for the reconstruction and fitting of public buildings to Mabetex, for which he was paid commissions, as were his sons-in-law.

Another company, Lightstar Low Voltage Systems, incorporated in the Isle of Man, owned by Stolpovskikh and directed in Geneva by attorney Gregory Connor, contracted with Mercata to accept the commissions paid on the contracts, and distributed them among offshore companies owned by Borodin's family and associates, such as Winsford Investment Ltd. in the Bahamas, owned by Stolpovskikh.

Borodin is also alleged to have committed money laundering in violation of Swiss Criminal Code Article 305bis by trying to conceal the kickbacks through transfers among Swiss bank accounts opened by the offshore companies at banks such as UBS in Geneva, Banque du Gothard in Lugano, Banque Adamas in Lugano. Each of the offshore companies then made further distributions to the Swiss bank accounts of other offshore entities controlled by Borodin, his family and associates, such as Somos Investments in Cyprus, and the Amadeus Foundation in Panama, both owned by Borodin, and the Thornton Foundation in Lichtenstein, owned by Borodin's daughter, Ekaterina Siletskaya. Attached

to the Request for Extradition is a two-page flow chart tracking the payment of monies from the awarding of the contracts, through the various corporate entities and bank accounts, to the various individuals named.

Borodin is also alleged to have participated in a criminal organization in violation of Swiss Criminal Code Article 260bis, by setting up a secret organization with his family and associates to obtain income by criminal means. According to the Request for Extradition, Gregory Connor, Fabrizio Izzo, Maurice Ramseyer, and Bedget Pacolli were indicted in June 2000 for money laundering and/or participation in a criminal organization in this case.

## I

■ There is a presumption against bail in extradition cases, because of the important national interest in successfully fulfilling our obligations under extradition treaties with other countries. Thus, release on bail is not granted to potential extraditees absent "special circumstances" and assurance that the extraditee is not a risk of flight. *Wright v. Henkel*, 190 U.S. 40, 23 S.Ct. 781, 47 L.Ed. 948 (1903); *Beaulieu v. Hartigan*, 554 F.2d 1 (1st Cir. 1977).

■ The "special circumstances" standard has been interpreted as limited to situations in which the justification for release is "pressing as well as plain." See *In re Mitchell*, 171 F. 289 (S.D.N.Y.1909) (L.Hand, J.); *In re Klein*, 46 F.2d 85 (S.D.N.Y.1930). Release on bail in extradition cases should be "an unusual and extraordinary thing." See *United States ex rel. McNamara v. Henkel*, 46 F.2d 84 (S.D.N.Y.1912).

At his first bail hearing before Magistrate Judge Pohorelsky on January 25, 2001, the Magistrate found that Borodin

had not sufficiently shown "special circumstances" justifying release, and made no ruling regarding risk of flight.

At the second bail hearing on March 9, 2001, the Magistrate found that Borodin had sufficiently established "special circumstances" relating to his duties in the Russian Federation government, but had not satisfied the Magistrate that he was not a risk of flight.

■■ A district judge reviews a magistrate judge's detention or release determination *de novo*. See *United States v. Leon*, 766 F.2d 77, 80 (2d Cir.1985). Though the Bail Reform Act does not apply in extradition cases, *de novo* review is also proper when bail is sought by petition for habeas corpus. See *Mapp v. Reno*, 241 F.3d 221 (2d Cir.); *United States v. Agnello*, 101 F.Supp.2d 108, 110 (E.D.N.Y.2000); *United States v. Leitner*, 784 F.2d 159 (2d Cir.1986).

## II

Borodin claims special circumstances justifying his release from detention while awaiting his extradition hearing on April 2, 2001. He also presents a "bail package" of restrictions he suggests may be imposed upon him, in an effort to relieve any concern that he may be a risk of flight. To some extent, these two arguments overlap, and the court will address them together.

Borodin asserts as a special circumstance his position as State Secretary of the Union of the Russian Federation and Belarus and his unique qualifications rendering irreplaceable his leadership in the conduct of Union business. In particular, he maintains that while in detention he cannot effectively supervise the preparation for an upcoming meeting of the Union delegates, at which important business will be conducted, including approval of the budget.

In support of his contentions, Borodin submits the statements of high ranking officials of the Russian–Belarus Union, including the President of Belarus, and the Prime Minister of the Russian Federation. They report the importance of his functions as State Secretary. He also includes a statement by the Deputy State Secretary, currently "temporarily acting as State Secretary of the Union," that he does not have the legal authority to make all of the decisions for which Borodin is responsible in preparation for the upcoming meeting.

Borodin has also provided a letter from Yuri Ushakov, Russian Ambassador to the United States. The letter states that Borodin's detention "makes it extremely difficult for any other official to perform the full scope of his duties in his absence", and has "most seriously hampered the activities of the supreme bodies of the Union."

In an effort to address the issue of risk of flight, Mr. Ushakov appeared at the first bail hearing on January 25, 2001, and stated that "[t]he Russian government guarantees and will ensure Mr. Borodin's appearance before the courts of the United States whenever required in this matter." The Ambassador went on to represent that the Russian government would post bail with the Court, and offered to let Borodin live at the Russian Consulate in New York.

Magistrate Judge Pohorelsky expressed concern that because the Russian Consulate is sovereign Russian diplomatic property under the Vienna Convention, neither United States nor Swiss authorities would be able to compel Borodin to leave that property should he choose not to. In addition, Article 61, Section 1 of the Russian Constitution provides that citizens of the Russian Federation "may not be deported out of Russia or extradited to another state."

Borodin offered to execute a waiver of his constitutional rights in this regard. The government replied that there is no assurance that the waiver would be enforceable under Russian law. In any event, the court should not get into the business of trying to interpret Russian constitutional law.

At the second bail hearing on March 2, 2001, Borodin offered to wear an electronic bracelet, and to provide at his own expense, 24–hour surveillance if he were allowed to live on "house arrest" at a location other than the Russian Consulate. The locations suggested were the residence attached to the Russian Orthodox Church, or a hotel or apartment on the upper east side of Manhattan. Borodin later provided a formal Diplomatic Note from the Russian Federation Embassy to the State Department undertaking to "observe" any Court order prohibiting Borodin from entering Russian diplomatic property. Borodin also offers a cash bond.

Borodin's argument for special circumstances warranting his release on bail is that he is an important person in the Russian–Belarus Union, and that important business requires attention he cannot properly devote to it in prison. He bolsters that argument with the assurances of the Russian government on his behalf, assurances he says provide verification of his importance to the Union.

 Further, Borodin asserts that the Swiss have not charged him with a crime for which he properly may be extradited. He argues at the outset that the Swiss Request for Extradition does not formally charge him with any crime, but rather rests only on a "soupçonné", or suspicion. He contends that Article I(1) of the Extradition Treaty requires that extraditees be "charged with ... an extraditable offense." This technical argument has been rejected by courts on several

grounds. These grounds are the principles that American courts cannot become enmeshed in the technicalities of foreign criminal processes, and that the "charge" requirement is satisfied by a requesting nation's intent to prosecute as evidenced by the record. See. e.g., *United States ex rel. Petrushansky v. Marasco*, 325 F.2d 562, 565 (2d Cir.1963) (American court should not interpret the Mexican constitution; evidence was sufficient to establish probable cause to extradite), cert. denied., 376 U.S. 952, 84 S.Ct. 969, 11 L.Ed.2d 971 (1964); *In the Matter of the Extradition of La Salvia*, 1986 WL 1436 (S.D.N.Y.1986) (filing of formal charges is not a prerequisite to extradition); *In the Matter of Assarsson*, 635 F.2d 1237, 1242–43 (7th Cir. 1980) (argument that the Treaty imposes requirement of formal charges is based on "semantics, not substance"); *Emami v. United States District Court for the Northern District of California*, 834 F.2d 1444 (9th Cir.1987) (government's intent to prosecute is sufficient to counter argument that extradition is sought only to question); *In the Matter of the Extradition of Lehming*, 951 F.Supp. 505 (D.Delaware 1996) (requesting nation's submitted evidence established intent to prosecute).

At oral argument, counsel for Borodin explained that the Swiss courts can only formally charge a defendant who physically appears before them. It would be absurd to hold that the Swiss cannot extradite Borodin to appear before their courts to be formally charged because they have not already formally charged him.

Article IX(3) of the Extradition Treaty with Switzerland provides in pertinent part that "[a] request for extradition which relates to a person sought who has not yet been tried shall be accompanied by: (a) a certified copy of the arrest warrant or any order having similar effect." This court has reviewed the Request for Extradition and the accompanying Declaration of Kenneth Propp, Attorney Adviser in the Office of the Legal Adviser for the United States Department of State.

█ It is clear to this court that the warrants dated January 10, 2000 and January 24, 2001, and the formal Request for Extradition fulfill the requirements of the Extradition Treaty. The Request for Extradition contains an extensive, specific and detailed account of the contractual and financial transactions in which Borodin and his family and associates are alleged to have engaged. The standard for extraditability is whether there is competent evidence to justify holding the accused to await trial, and not whether the evidence is sufficient to justify a conviction, *Collins v. Loisel*, 259 U.S. 309, 316, 42 S.Ct. 469, 66 L.Ed. 956 (1922); *LoDuca v. United States*, 93 F.3d 1100, 1104 (2d Cir.1996). The evidence submitted appears sufficient to show Borodin is extraditable.

At the first bail hearing, when asked what the special circumstances were, his counsel replied in part, "you won't find, I don't think, any other case with[in] modern jurisprudential history where an ambassador comes into court and gives a formal commitment on behalf of his government to the government of the United States that he will be made available and that their government needs him to perform his duties."

█ To the extent that Borodin's argument for special circumstances is based on the assurances of the Russian government that he will be made available, it fails. Absence of risk of flight is not a legally cognizable "special circumstance" justifying release from bail. See, e.g., *Salerno v. United States*, 878 F.2d 317, 318 (9th Cir. 1989); *United States v. Leitner*, 784 F.2d 159, 161 (2d Cir.1986); *Lo Duca v. United States*, 1995 WL 428636 (E.D.N.Y.).

At the second bail hearing, counsel argued, "what makes this a special circumstance, unique, there is no other case like this, is that it is not just some other chief executive officer and it is not just some company man." In its papers and in oral argument, counsel supported its argument with extensive information regarding Borodin's personal and professional experience and standing in both the Russian and Belarus political communities.

The Russian–Belarus Union is undeniably an important economic and political body, and the position of State Secretary is undoubtedly important to the running of the Union. Indeed, the importance of the business of the Union argues against the contention that a leader in absentia attempting to oversee that business from a foreign hotel room will be sufficiently more effective than one doing so from a foreign prison cell.

█ In many ways, Borodin's argument is really that his presence is crucial to the Union, rather than that he can function adequately as a leader of the Union if only he is released' from prison to 24–hour house arrest. While there are undoubtedly large differences between prison and house arrest in terms of comfort and convenience to Borodin and his associates, these are not enough to constitute "special circumstances." See *In re Klein,* 46 F.2d 85 (S.D.N.Y.1930).

█ Borodin contends that his unique background makes him uniquely qualified to bring the representatives of these two nations together, in a young and fragile Union. The argument for special circumstances depends quite heavily on the proposition that Borodin himself is indispensable to his important position. This is not so much an argument of special circumstances as it is an argument for the special status of Borodin himself. While the court does not question Borodin's qualifications

for his position, Borodin's status does not constitute a special circumstance which overcomes a presumption against bail in extradition cases.

The conduct of Union business from prison is undeniably difficult. Borodin may make telephone calls and see visitors in prison, albeit on a limited basis. He does not have computer access, nor can he receive faxes in prison. But he may receive documents there, and review them with his visitors. According to the Ambassador's statement at the first bail hearing, his chief of staff may be made available to him in New York. His responsibility as State Secretary is presently being covered by the Deputy.

The most pressing task that Borodin cites in his argument is the preparation of a budget for the upcoming Union. While the upcoming Union meeting was rescheduled from March until April, that kind of delay due to the unavailability of a significant participant is not uncommon in the course of business or governmental affairs, and does not constitute an extraordinary hardship.

It is difficult to see how moving Borodin from prison to 24–hour confinement can significantly relieve any ongoing harm claimed to be visited upon the functioning of the Union. The court is not persuaded that other administrative remedies could not be employed to continue this work of the Union in Borodin's absence, as indeed it has been doing since he left Russia prior to his arrest on January 17, 2001.

At the level of international economic and political affairs, Borodin's contentions do not show the kind of "special circumstances" that might justify release on bail. See *United States v. Kin–Hong,* 83 F.3d 523 (1st Cir.1996) (court found no special circumstances to justify release on bail where reversion of sovereignty of Hong

Kong to People's Republic of China presented legal issues concerning petitioner's extraditability to Hong Kong and delay in proceedings).

The circumstances in this case are unusual and unfortunate. Many extradition cases entail unusual and unfortunate circumstances. In reviewing the entire record, this court does not find that Borodin has made a showing of special circumstances sufficient to overcome the presumption against bail.

### III

At oral argument on the habeas corpus petition, counsel for Borodin characterized Magistrate Judge Pohorelsky's finding of risk of flight as "minimal." This is not altogether accurate, and this court does not agree with such an assessment.

 A fundamental inquiry in the measurement of an extraditee's risk of flight is whether he has sufficient ties to the community to make flight unlikely. See, e.g., *Extradition of Nacif-Borge*, 829 F.Supp. 1210 (D.Nev.1993). There is no dispute in this case that Borodin has no significant ties to the United States which would prevent his flight.

Further, the Russian government has taken the position that Borodin did not commit any crime in connection with the transactions underlying the Swiss extradition request. Coupled with Borodin's political and financial influence in Russia, it would seem that he has significant motive and potential for opportunity to flee if released.

Magistrate Judge Pohorelsky found, in the second bail hearing, that though "the risk may not be high, given the undertakings that have been made by the Russian Government, it is a risk I just cannot ignore." The Magistrate Judge was primarily concerned that, even under 24–hour

surveillance, Borodin could seek haven within the consulate or on another Russian diplomatic property.

 In an effort to alleviate that concern, Borodin has provided a Diplomatic Note from the Russian Federation to the United States Department of State, stating:

> If the Court decides to release P.P. Borodin on bail until the hearing in the matter of extradition from the USA to Switzerland under the condition of prohibiting P.P. Borodin from visiting Russian diplomatic and consular agencies in the USA, the Russian Party will observe the aforementioned order of the Court.

While there is no reason for the court to question the good faith of this statement, it remains an incontrovertible fact that, if released on bail, under whatever surveillance, Borodin could potentially secret himself in Russian diplomatic property. If that were to happen, neither American nor Swiss authorities could enforce his extradition or even his court appearance, and the Russian government, by the terms of its own Constitution, would be faced with violating the Constitutional rights of its own citizen if it were to give him up for extradition upon the request of the American or Swiss governments.

 Although Borodin offers to waive this constitutional right not to be extradited, this court has no jurisdiction to accept his waiver on behalf of the Russian government, and claims no competence to decide whether the waiver would be enforceable under Russian law. See, e.g., *United States ex rel. Petrushansky v. Marasco*, 325 F.2d 562, 565 (2d Cir.1963) (American court should not interpret the Mexican constitution), cert. denied., 376 U.S. 952, 84 S.Ct. 969, 11 L.Ed.2d 971 (1964).

Magistrate Judge Pohorelsky also asked for input from the United States Depart-

ment of State on the issues of the inviolability of Russian diplomatic and consular premises, and of the guarantees made by Russian Ambassador Ushakov. He received a letter dated March 8, 2001, in which the Department outlined the provisions of the 1963 Vienna Convention on Consular Relations and the 1964 Consular Convention and Protocol between the United States and the Soviet Union.

The Department then stated that the Russian Federation could waive the immunity of its consular officers and employees and its Consul General by express writing, and could agree to be bound by a court order. The letter quoted a provision of the Consular Convention which states that "[w]ithout prejudice to their privileges and immunities, it is the duty of all persons enjoying such privileges and immunities to respect the laws and regulations of the receiving state."

This says no more than that the Russian Federation may waive the immunity of its diplomatic personnel, and that those with Russian diplomatic immunity must "respect" the laws of the United States without compromising their immunity. None of these conditions applies to Borodin, who does not have diplomatic immunity. They might apply in a situation where a Russian diplomat was offering safe haven to Borodin in contravention of a court order, but not if Borodin were on Russian diplomatic property the immunity of which has not been expressly waived.

The Russian Federation has not offered to waive the immunity of its Consulate. It has agreed to "observe" any court order which prohibits Borodin from "visiting Russian diplomatic or consular agencies." Presumably this means that the Russian Federation would not allow Borodin onto such diplomatic property, though it does not expressly say so, and does not say that the Russian Federation would deliver Bo-

rodin to American or Swiss authorities if he were somehow to find his way onto such properties. Nor would the court expect the Russian Federation to make such guarantees in contravention of its own constitutional prohibition against extradition of its citizens.

The State Department then addressed the issue of Ambassador Ushakov's guarantees as follows:

The State Department has no reason to doubt the good faith of Ambassador Ushakov or the Government of the Russian Federation and, in fact, routinely relies on such good faith for the conduct of diplomatic relations with Russia and other countries. However, we note that Mr. Borodin's Memorandum of Law dated February 26, 2001 supporting his application for bail, cites the *Restatement (Third) of Foreign Relations Law of the United States,* sections 302 and 321, for the proposition that an Ambassador's representations to a U.S. Court should constitute a binding agreement under the principles of international law. These provisions of the Restatement restate the international law principle that an international agreement is an agreement between two or more states that is intended to be legally binding upon them. The cited sections of the Restatement are not relevant, however, in the absence of mutual agreement between two or more states.

At oral argument, Borodin's counsel attempted to characterize this carefully worded letter as a document in which "the State Department has chosen to speak on these issues [and] has not opposed Mr. Borodin's release on bail under appropriate circumstances." This is misleading.

The Department was asked specifically to speak on these two issues by Magistrate Judge Pohorelsky; it did not choose to weigh in on Borodin's behalf. Further,

the Department did not offer an opinion one way or the other concerning Borodin's bail eligibility under any circumstances.

What the letter does say is that the Ambassador's statements, while taken in good faith, do not, contrary to Borodin's memorandum, represent a binding agreement between the two nations, because there is no mutual agreement between the two nations. Therefore, the Ambassador cannot legally bind the Russian Federation with his statements.

At oral argument, counsel for Borodin asked the court to review *Kin–Hong v. United States,* 926 F.Supp. 1180 (D.Mass. 1996), in which the district judge found that the petitioner demonstrated conditions of release that would reasonably assure his presence at future proceedings, and granted bail with elaborate conditions similar to those proposed by Borodin.

The court has reviewed this case, and finds that the underlying facts are not comparable to those here. In any event, the First Circuit Court of Appeals reversed the district court's decision, finding no special circumstances. See *United States v. Kin–Hong,* 83 F.3d 523 (1st Cir. 1996).

Borodin's offer to pay for 24–hour surveillance including the wearing of an electronic bracelet and confinement to a selected location would be rejected even if sovereign Russian property were not so proximately available as it is here in New York. In the first place, such arrangements are never one hundred percent infallible, and the presumption against bail in extradition cases counsels against incurring even a small risk absent special circumstances. The risk in this case is not negligible, considering the relative ease with which Borodin could enter Russian diplomatic property in the City of New York if he were able to evade his detainers.

Second, it is contrary to underlying principles of detention and release on bail that individuals otherwise ineligible for release should be able to buy their way out by constructing a private jail, policed by security guards not trained or ultimately accountable to the government, even if carefully selected. Even if the cost of surveillance is covered by Borodin, the government still incurs an added administrative burden in supervising the surveillance. See, e.g., *United States v. Agnello,* 101 F.Supp.2d 108, 115 (E.D.N.Y.2000); *United States v. Bellomo,* 944 F.Supp. 1160, 1167 (S.D.N.Y.1996).

Given Borodin's lack of ties to the United States, his motive and opportunity to flee, and underlying policy mitigating against private detention arrangements, the court finds that there is a significant risk of flight in Borodin's case, and rejects his proposal to be released under private surveillance.

The petition for habeas corpus is denied.

So ordered.