06-5137-pr
Sacirbey v. Guccione

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: February 26, 2008                                    Decided: December 9, 2009)

Docket Nos. 06-5137-pr (L), 07-0018-pr (con)

MUHAMED SACIRBEY,

       *Petitioner-Appellant*,

       v.

JOSEPH R. GUCCIONE, United States Marshal for the SDNY; Officer DENNIS SPITZER,
Chief Pretrial Services for the Southern District of New York,

       *Respondents-Appellees*.

Before: KEARSE, LEVAL, and CABRANES, *Circuit Judges*.

Appeal from a September 7, 2006 order of the United States District Court for the Southern District of New York (Barbara S. Jones, *Judge*) denying a petition for a writ of habeas corpus brought under 28 U.S.C. § 2241. In this case, a treaty authorizes the extradition of an individual who has been "charged" with a crime and requires that an arrest warrant and supporting materials be provided in order to obtain that extradition. Where, as here, the relevant arrest warrant was issued by a court that neither has jurisdiction over the matter nor authority to enforce the warrant, the requirement of the treaty that an individual be "charged" with an extraditable offense has not been satisfied. Accordingly, we reverse the order of the District Court denying the petition, grant the petition for a writ of habeas corpus, vacate the restrictions on Sacirbey's liberty, and hold that he may not be extradited pursuant to any formal requests that have been made.

1

Judge Kearse dissents in a separate opinion.

JAMES J. MCGUIRE (Kesari Ruza, Timothy J. McCarthy, Elizabeth Rotenberg-Schwartz, Sean J. Kirby, *of counsel)*, Sheppard, Mullin, Richter & Hampton LLP, New York, NY, *for Petitioner-Appellant Muhamed Sacirbey.*

ANJAN SAHNI, Assistant United States Attorney (Michael J. Garcia, United States Attorney, *on the brief*, Jonathan S. Kolodner, Assistant United States Attorney, *of counsel)*, Office of the United States Attorney for the Southern District of New York, New York, NY, *for Respondents-Appellees Joseph R. Guccione and Dennis Spitzer.*

JOSÉ A. CABRANES, *Circuit Judge*:

In this appeal we consider whether an arrest warrant issued by a foreign court that no longer has jurisdiction over the accused, nor the power to enforce the warrant, can provide an adequate basis for the extradition of a United States citizen. This is a question of first impression—and the fact that this issue has not been previously decided should not be surprising. It is a rare circumstance where the very document that provides the basis for an extradition request turns out to have been issued by an entity that no longer has lawful authority over the matter. While the factual and procedural history of this case is extraordinary, our resolution of it requires only that we apply the plain meaning of the provisions of the relevant treaty. The treaty authorizes the extradition of an individual who has been "charged" with a crime and requires that an arrest warrant and supporting materials be provided in order to obtain that extradition. Because the arrest warrant at issue in this case was issued by a court that neither has jurisdiction over the matter nor authority to enforce the warrant, the requirement of the treaty that an individual be "charged" with an extraditable offense has not been satisfied. This defect falls within the narrow category of issues that is cognizable on habeas review of an extradition order; we therefore reverse the order of the District Court denying the petition for a writ of habeas corpus.

**BACKGROUND**

**A.      Factual Overview**[1]

Muhamed Sacirbey, also known as Muhamed Sacirbegovic, was born in 1956 in Sarajevo, Yugoslavia.  At that time, the Communist regime led by Josip Broz (Tito) controlled Yugoslavia, and Sacirbey's parents opposed Tito's authoritarian government.  For their dissenting political beliefs, Sacirbey's parents were imprisoned for a time.  In the 1960s, the Sacirbey family fled Yugoslavia and immigrated to the United States, where they settled in Ohio.  On April 27, 1973, at the age of sixteen, Sacirbey became a naturalized citizen of the United States.  During the years that followed, Sacirbey attended Tulane University on a football scholarship; he earned a bachelor's degree and a degree in law at Tulane and a Master of Business Administration degree at Columbia University.  After his admission to the Bar of the State of New York, Sacirbey worked as a lawyer for a New York law firm.  In the 1980s, he left his law firm to work in the financial sector, first as a Vice President at Standard and Poor's, the rating agency, and later as Vice President of an investment bank.

On April 5, 1992, the Republic of Bosnia and Herzegovinia ("Bosnia") declared its independence from Yugoslavia.  The United States officially recognized Bosnia's independence two days later, and Bosnia was admitted to membership in the United Nations on May 22, 1992.  Shortly thereafter, Bosnian President Alija Izetbegovic, a leader of the Muslim community of Bosnia, appointed Sacirbey to serve as Bosnia's ambassador to the United Nations.  Despite international recognition, Bosnian Serbs continued to oppose independence and, with the support of the government of Serbia—a neighboring province in the former Yugoslavia—launched a violent campaign to partition the country along ethnic lines.  According to the United States Department of State, "[t]he conflict

---

[1] Unless otherwise noted, the following facts are not in dispute.

3

continued through most of 1995, and many atrocities were committed, including acts of genocide

committed by members of the [Bosnian Serb armed forces] in and around Srebrenica from July 12-22,

1995, where approximately 8,000 Bosnian Muslim men and boys were killed." Bureau of European and

Eurasian Affairs, U.S. Dep't of State, *Background Note: Bosnia and Herzegovina* (2009), *available at*

www.state.gov/r/pa/ei/bgn/2868.htm (last visited December 8, 2009). Sacirbey, appointed Bosnian

Foreign Minister upon the assassination of his predecessor in 1995, represented Bosnia at peace talks

held in 1995 outside of Dayton, Ohio.[2] Those talks lead to the Dayton Peace Accords, which were

formally signed on December 14, 1995 in Paris and which ended the war in Bosnia after more than

three years and ensured Bosnia's independence under the supervision of a High Representative selected

by the United Nations Security Council. *Id.*

Sacirbey continued to represent Bosnia at the United Nations until 2000. During his eight-year

tenure as Bosnia's first United Nations ambassador, Sacirbey opened the Permanent Mission to the

United Nations and the General Consulate of Bosnia in New York (the "U.N. Mission"), promoted the

creation of the International Criminal Tribunal for the former Yugoslavia (the "ICTY"),[3] and managed

the legal team in an action against Yugoslavia for genocide in the International Court of Justice

("ICJ").[4] For much of this period, the finances of the U.N. Mission were in disarray. Sacirbey claims

---

[2] Sacirbey's involvement in the Bosnian peace process has been described in the memoirs of several United States officials. *See* Bill Clinton, *My Life* 668 (describing Sacirbey's involvement in the American peace mission to Bosnia and his role as "the eloquent public face of Bosnia on American television"); Richard Holbrooke, *To End a War* 34-35 (stating that Sacirbey was his "first Bosnian friend," and detailing Sacirbey's role in the Dayton peace talks); Strobe Talbott, *The Great Experiment: The Story of Ancient Empires, Modern States, and the Quest for a Global Nation* 306-07 (characterizing Sacirbey as "the pugnacious, thoroughly Americanized foreign minister of Bosnia").

[3] Sacirbey also served as Bosnia's representative to the ICTY.

[4] Sacirbey served as Bosnia's agent before the ICJ and later as a Vice Chairman of the Preparatory Committee of the International Criminal Court.

4

that he received no salary for his services and that he had to open the U.N. Mission using his personal resources, including fees from his speaking engagements, and by soliciting contributions from sympathetic nations. As Sacirbey concedes, funds earmarked for one project were often spent on another, and personal bank accounts were used to house those funds. *See* J.A. 11-12 (Affidavit of Muhamed Sacirbey, Mar. 17, 2005, at ¶¶ 21-27).[5]

Sacirbey resigned from his ambassadorship and returned to private life in the United States in December 2000. After his resignation, Sacirbey claims to have learned that Bosnian Foreign Minister Zlatko Lagumdzija, a perceived political adversary of Sacirbey and allegedly a former official in the Communist Party, had launched an investigation of him. In early 2001, the Foreign Ministry requested that the Cantonal Prosecutors Office in Sarajevo[6] investigate alleged financial irregularities at the U.N. Mission during Sacirbey's tenure. On April 11, 2001, the Cantonal Prosecutor submitted a Demand for Investigation to the Cantonal Court, alleging that Sacirbey had abused his office in violation of Bosnian law. Specifically, the prosecutor alleged that (1) Sacirbey had embezzled $610,982.46 and (2) there was a $1.8 million shortfall in an investment account over which Sacirbey had signature authority.[7] *See*

---

[5] Sacirbey also claims that he was authorized to reallocate funds in this fashion, and that his efforts before the ICTY and ICJ were approved by President Izetbegovic. *See* J.A. 10 (Affidavit of Muhamed Sacirbey, Mar. 17, 2005, at ¶ 18).

[6] Following the Dayton Peace Accords, Bosnia was divided into two sub-divisions: the Federation of Bosnia and Herzegovina and Republika Srpska. The Federation of Bosnia and Herzegovina was, in turn, divided into ten "cantons." *See* Bureau of European and Eurasian Affairs, U.S. Dep't of State, *Background Note: Bosnia and Herzegovina* (2009), *available at* www.state.gov/r/pa/ei/bgn/2868.htm (last visited May 27, 2009). As the District Court observed, "Cantons [are] similar to municipalities or counties in the United States." *Sacirbey v. Guccione*, No. 05 Cv. 2949, 2006 U.S. Dist. LEXIS 64577, at *3 n.3 (S.D.N.Y. Sept. 7, 2006) ("*Sacirbey II*").

[7] The $1.8 million shortfall was determined by a commission that investigated the matter not to be part of the U.N. Mission's deficit because those funds had been donated by the government of Saudi Arabia and therefore did not belong to the Ministry. *Sacirbey II*, 2006 U.S. Dist. LEXIS 64577, at *5 n.6.

*Sacirbey v. Guccione*, No. 05 Cv. 2949, 2006 U.S. Dist. LEXIS 64577, at *4 (S.D.N.Y. Sept. 7, 2006)

("*Sacirbey II*").  In response to the prosecutor's application, the Cantonal Court issued a Decision to

Investigate Sacirbey on August 20, 2001, and later, on December 5, 2001, a Decision for Detention and

an International Arrest Warrant for Sacirbey.  *Id.* at *5-6.

Bosnia sought the extradition of Sacirbey in a formal request to the United States Department

of Justice dated January 29, 2002.  Bosnia's request was made pursuant to an extradition treaty executed

in 1902 by the United States and the Kingdom of Serbia (the "Treaty"),[8] which provides, in part, that

> The Government of the United States and the Government of Servia [sic] mutually agree to
> deliver up persons who, having been charged with or convicted of any of the crimes and
> offenses specified in the following article, committed within the jurisdiction of one of the high
> contracting parties, shall seek an asylum or be found within the territories of the other:
> Provided, that this shall only be done upon such evidence of criminality as, according to the
> laws of the place where the fugitive or person so charged shall be found, would justify his or
> her apprehension and commitment for trial if the crime or offense had been committed there.

Treaty for Mutual Extradition of Fugitives from Justice, U.S.-Serb., art. I, Mar. 7, 1902 (date of

ratification by the President), 32 Stat. 1890, 12 Bevans 1238.  Under Article II of the Treaty,

"[e]mbezzlement by public officers" is among the offenses specified for extradition.  *Id.*  In order to

secure extradition of a "fugitive [who] is merely charged with crime," Article III of the Treaty requires

the requesting government to provide "a duly authenticated copy of the warrant of arrest in the country

where the crime has been committed, and of the depositions or other evidence upon which such

warrant was issued . . . ."  Article IV provides that "in advance of the presentation of formal proofs,

---

[8] This treaty applies to Bosnia as a successor state to the former Federal Peoples' Republic of
Yugoslavia, which was, in turn, a successor state to the Kingdom of Serbia.  *See In re The Extradition
of Muhamed Sacirbegovic,* No. 03 Crim. Misc. 01, 2005 U.S. Dist. LEXIS 707, at *30-32 (S.D.N.Y. Jan.
19, 2005) ("*Sacirbey I*") ("[T]he United States . . . consider[s] the Treaty to be in effect between the
United States and [Bosnia]."); *see generally 767 Third Ave. Assocs. v. Consulate Gen. of the Socialist Fed.
Republic of Yugo.*, 218 F.3d 152, 156 (2d Cir. 2000) (noting that Bosnia is among the successor states
of Yugoslavia); *Ivancevic v. Artukovic*, 211 F.2d 565, 573 (9th Cir. 1954) ("[T]he extradition treaty
executed by and between the United States and Serbia in 1902 is a present, valid and effective treaty
between the United States and the Federal Peoples' Republic of Yugoslavia.").

complaint on oath . . . shall be made by an agent of the Government of Servia [sic] before a judge or other magistrate authorized to issue warrants of arrest." In addition, the Treaty provides that "[n]either of the high contracting parties shall be bound to deliver up its own citizens or subjects under the stipulations of this Treaty," *id.* at art. V, and that "offense[s] of a political character" may not lead to extradition under the Treaty, *id.* at art. VI.

While the Treaty expressly authorizes the United States to decline to extradite Sacirbey because he is a U.S. citizen, the Department of State is authorized by statute to extradite U.S. citizens who otherwise come within the scope of the relevant extradition treaty. *See* 18 U.S.C. § 3196 ("If the applicable treaty or convention does not obligate the United States to extradite its citizens to a foreign country, the Secretary of State may, nevertheless, order the surrender to that country of a United States citizen whose extradition has been requested by that country if the other requirements of that treaty or convention are met."). The Department of State appears to have chosen to exercise its discretion in this case by requesting Sacireby's extradition. On March 17, 2003, the Department of Justice filed a Complaint for Arrest with a View Towards Extradition of Sacirbey in the United States District Court for the Southern District of New York. Sacirbey was arrested in March 2003 and detained for over a year until he was released on bail in July 2004.[9]

## B.     Procedural History

The matter was assigned to Magistrate Judge Frank Maas for a determination of whether Sacirbey should be extradited pursuant to Bosnia's request. *See In re The Extradition of Muhamed Sacirbegovic,* No. 03 Crim. Misc. 01, 2005 U.S. Dist. LEXIS 707, at *1 (S.D.N.Y. Jan. 19, 2005) ("*Sacirbey I*"). Judge Maas held a hearing on December 23, 2003, during which the government introduced the

---

[9] By contrast, the Cantonal Court's related Order of Detention authorizes Sacirbey's detention for a "not . . . longer than one month." J.A. 303 ("Decision for Detention," Cantonal Court in Sarajevo, Dec. 5, 2001).

following evidence in support of extradition: (1) the Cantonal Court's August 20, 2001 Decision to Investigate; (2) the Cantonal Court's December 5, 2001 Decision for Detention and International Arrest Warrant for Sacirbey; (3) the sworn statements of three witness; and (4) an affidavit from Robert E. Dalton, the Assistant Legal Adviser for Treaty Affairs at the United States Department of State, briefly explaining the history of the Treaty. *See id.* at *10-17; Appellees' Br. 7-8.

Sacirbey opposed extradition on the grounds that (1) there was no valid extradition treaty between the United States and Bosnia, (2) the offense of Abuse of Office or Authority for which extradition was sought failed to meet the Treaty requirements, (3) Bosnia had failed to charge him formally with an extraditable offense; (4) Bosnia had failed to establish probable cause to believe that he committed any crimes, and (5) his conduct fell within a Treaty exception for crimes of a political character. *Sacirbey I*, 2005 U.S. Dist. LEXIS 707, at *2. In support of his case, Sacirbey offered his own testimony, as well as the testimony of Paul Robert Williams, a former State Department employee and current professor of law, and the declaration of Michael Hartmann, then an adviser to the State Department on matters of criminal prosecution in Afghanistan, as an expert on Bosnian criminal law. Sacirbey testified that the finances of the U.N. mission were haphazard during his tenure and that his political adversaries were using a criminal investigation to retaliate against him. *Id.* at *20-25. Professor Williams corroborated Sacirbey's claims, testifying that "after Sacirbey left office, the party controlling the Bosnian government changed hands, and the new party, 'which was the former communist party, essentially recloaked, had a very specific motive in going after members of the former regime to discredit them for political reasons.'" *Id.* at *19-20.

In an Opinion and Order dated January 19, 2005, Magistrate Judge Maas granted the extradition request. Rejecting Sacirbey's arguments, Magistrate Judge Maas concluded that (1) Bosnia had succeeded to the Treaty, *see id.* at *33-34; (2) the offense of "abuse of authority" was sufficiently

8

equivalent to "embezzlement by public officers" to warrant extradition under the Treaty, *see id.* at *45; (3) a formal criminal charge is not required by the Treaty, *see id.* at *47-48, (4) probable cause had been established by the affidavits submitted in support of the extradition request, *see id.* at *57; and (5) the political-crimes exception did not apply to allegations of embezzlement, *see id.* at *58-61. On January 25, 2005, Judge Maas issued a Certification of Extraditability and Order of Commitment. **[A 794]**

Three months later, Sacirbey filed a petition for a writ of habeas corpus pursuant to 28 U.S.C § 2241 in the United States District Court for the Southern District of New York (Barbara S. Jones, *Judge*).[10] Observing that the scope of its review was limited to determining whether (1) the magistrate judge had jurisdiction, (2) the charged offense fell within the Treaty and (3) there was a reasonable ground to believe the accused guilty of the charged offense, the District Court denied Sacirbey's petition. *See Sacirbey II*, 2006 U.S. Dist. LEXIS 64577, at *19 (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)).

In his habeas petition, Sacirbey did not challenge Magistrate Judge Maas's jurisdiction over Bosnia's extradition request, so that ground for habeas relief was effectively conceded. *See id.* at *19 n.10. Instead, he pressed the two other claims cognizable on habeas review, and made several constitutional challenges to the adequacy of the proceedings before Magistrate Judge Maas.

With respect to the second claim cognizable on habeas review, Sacirbey failed to persuade the District Court that he was not "charged" with an extraditable offense.[11] Sacirbey argued, *inter alia*, that legal reforms in Bosnia had deprived the Cantonal Court of jurisdiction over this matter, thereby

---

[10] Sacirbey could not appeal Magistrate Judge Maas's decision because "[a]n order granting or denying [extradition] is not appealable. An extraditee's sole remedy from an adverse decision is to seek a writ of habeas corpus; the Government's sole remedy is to file a new complaint." *Ahmad v. Wigen*, 910 F.2d 1063, 1065 (2d Cir. 1990) (internal citations omitted).

[11] Before Judge Jones, Sacirbey abandoned his argument that Bosnia did not succeed to the Treaty. *See Sacirbey II*, 2006 U.S. Dist. LEXIS 64577, at *21.

nullifying the arrest warrant for Sacirbey. At oral argument before the District Court, counsel for Sacirbey emphasized, "The Cantonal Court is done. It does not exist . . . . The old system under which my client was charged has disappeared." J.A. 845 (Tr. of Proceedings 50:1-4, Oct. 4, 2005). In light of the government's concession that "[t]here is ambiguity" as to whether the Cantonal Court has jurisdiction over the investigation of Sacirbey," J.A. 851 (Tr. of Proceedings 56:15-16, Oct. 4, 2005), the District Court authorized the parties to submit additional briefing on the question of whether a court had jurisdiction over the investigation of Sacirbey.

Pursuant to the District Court's authorization, Sacirbey submitted declarations from his Bosnian lawyer, Zlatan Terzic, and from Michael Hartmann, the same expert who had previously filed a declaration in opposition to the government's application to extradite Sacirbey. The Terzic declaration stated that, based on Terzic's personal inquiries, neither the Cantonal Court nor the Court of Bosnia and Herzegovina (the "National Court") "has been seized of the case against . . . Sacirbey. Therefore, there is no forum available to us to approach for resolution, to petition for appropriate remedies, or to challenge the propriety and legality of this allegedly ongoing investigation." J.A. 871-72 (Nov. 22, 2005 Decl. of Zlatan Terzic ¶ 2). The Hartmann Declaration stated flatly that, "by the admissions of the Bosnian [government] . . . neither the National nor Cantonal Court, nor the Cantonal Prosecutor, have possession of the case. The only state organ not denying possession of the case but rather affirming its possession is the office of the National Prosecutor." J.A. 910 (Nov. 22, 2005 Decl. of Michael Hartmann ¶ 25). Sacirbey argued that, because no court had jurisdiction over his case, he was not charged with a crime, but only the target of an investigation.[12]

---

[12] In a telephonic conference before Magistrate Judge Maas, Professor Cherif Bassiouni, testifying on behalf of Sacirbey, suggested that it was within Bosnia's power to dispel any ambiguity caused by the changes its legal system. He testified as follows:

As a matter of formal submissions[,] when an extradition is submitted[,] it is submitted by a

In response, the government submitted two letters written by Amra Kosovic, Counselor to the Bosnian Embassy in Washington, D.C.  Kosovic's first letter, dated October 11, 2005, stated that "[the National Court] will proceed in the matter of [Sacirbey] if the request for extradition would be approved by the appropriate authorities of [the] United States."  J.A. 960 (Oct. 11, 2005 Letter of Amra Kosovic).  A second letter, dated November 10, 2005, was more equivocal on the question of whether the National Court had jurisdiction over the case.  Kosovic's letter stated in relevant part:

> The Cantonal Court . . . exists and hears all cases that are within its jurisdiction.  During the period of justice system reforms, the [National Court] was established and the [National] Court *can, on request of the parties in a case, decide to hear this case* of extradition or any other case if the necessary requirements according to the [Bosnian Criminal Procedure Code are met].  As you were informed, [the] Prosecutor's Office of Bosnia . . . has sent notice that [it] took the investigation which was previous[ly] held by [the] Prosecutor's Office of Canton Sarajevo.

J.A. 961 (Nov. 10, 2005 Letter of Amra Kosovic) (emphasis added).  Recognizing that these letters "do[ ] not elaborate on the relationship between the Cantonal Court, which originally issued the arrest warrant and demand for investigation against Mr. Sacirbey, and the [National Court], which now appears to be . . . seized of jurisdiction over Mr. Sacirbey's case," the government argued that these

---

> government and attached to it are judicial documents.  When Bosnia filed its request, it had a document presented by its executive branch[,] attached to it were the documents by the judicial branch in accordance with the treaty and in accordance with international practice. What happened is an intervening factor in which as far as we're concerned we do not know its implications which says the person who issued that original warrant no longer ha[s] that authority.
> . . .
>
> [T]he [United States] Government may be in a better position to save us all the time and effort to have to argue what is the intent of this new Bosnian law by getting some official judicial document from the requesting state [*i.e.*, Bosnia] that confirms the ongoing validity of prior warrants . . . issued by Cantonal prosecutors.

J.A. 405-06 (Tr. of Proceedings 13:12-22, 14:22-15:1, Nov. 3, 2003).  The Bosnian government did not make a submission along the lines suggested by Professor Bassiouni.

11

letters nevertheless demonstrated that "a Bosnian court . . . would handle Mr. Sacirbey's proceeding upon his extradition." J.A. 958 (Nov. 22, 2005 Letter of Assistant United States Attorney Anjan Sahni).

The District Court agreed with the government. Explaining that the "issue arises because of [Bosnia's] change from a civil law to a common law system[13] since the issuance of the original Demand against Sacirbey," the District Court found that "the investigative functions which had been vested in [Bosnia's] civil law courts were transferred to independent prosecutors at the cantonal and national levels[, and] a National Court system was established, equivalent to the United States federal court system, and a new National Criminal Code was adopted." *Sacirbey*, 2006 U.S. Dist. LEXIS 64577 at *23 n.12. The District Court concluded that, "by the time the United States Government filed the Complaint, the Investigative Office of the Cantonal Court that had issued the Warrant Order no longer had any power to enforce it." *Id.* These developments were "quite beside the point," in the view of the District Court, because "[a]ll that is required is that Sacirbey be 'charged,' which he had been at the time his extradition was sought, and continues to be." *Id.* at *23.

Relying on authority from the Seventh Circuit and a district court in our Circuit, the District Court observed that "[t]he term 'charge,' in this context, has been interpreted by courts to require something less than a formal charge: for example, the requirement has been deemed satisfied where a subject is 'accused,' or the requesting nation 'intends to prosecute' him." *Id.* at *21 (quoting *In re*

---

[13] Apparently, this change refers to Bosnia's transition from a system of court-conducted prosecutions to an adversarial system with independent prosecutors and a neutral judge. It cannot be gainsaid that the current administrative and political situation in Bosnia is uncertain. *See* USAID, *Bosnia-Herzegovinia: Overview*, *available at* www.usaid.gov/locations/europe_eurasia/countries/ba/ (last visited May 27, 2009) ("After extensive negotiations, the European Union (EU) signed a Stabilization and Association agreement with [Bosnia] in 2008, the first step in the process of becoming a candidate for EU membership. However, ethnic tensions and a largely dysfunctional, multi-layered governance structure geared toward safeguarding the rights of the various ethnic groups still hinder development. Reforms, such as establishing strong state-level institutions, privatizing state-owned industry, fighting corruption, and making meaningful progress in the rule of law, require continued effort.").

12

*Assarsson*, 635 F.2d 1237, 1242 (7th Cir. 1980) ("*Assarsson I*"); *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 129 (E.D.N.Y. 2001)) (brackets omitted). The District Court held that the evidence showed Bosnia's intent to prosecute Sacirbey for abuse of authority. This determination was based on the record developed in the proceedings before Judge Maas and on the two letters written by Kosovic, the Bosnian Embassy counselor, which demonstrated to the District Court "a *present* intent to prosecute Sacirbey in the National Court [of Bosnia]." *Sacirbey II*, 2006 U.S. Dist. LEXIS 64577, at *23 (emphasis added).

The District Court also determined that the charged offense, "abuse of authority," fell within the Treaty's enumerated offenses—namely, the offense of embezzlement. *See id.* at *24 (citing Art. II of the Treaty). It further held that the requirement of "dual criminality"—*i.e.*, that the alleged conduct constitute a criminal offense in both countries—was "easily satisfied" because "there are numerous federal crimes for which Sacirbey could have been charged in the United States based on the allegations against him." *Id.* at *33. The political offense exception set forth in Article VI of the Treaty did not bar Sacirbey's extradition, according to the District Court, because the exception applied to "political *offenses*—not political figures," *id.* at *34, and the financial misconduct at issue here did not constitute a political offense. Accordingly, the District Court concluded that the charged offense fell within the scope of the Treaty.

Turning to the third claim cognizable on habeas review of an extradition order, the District Court determined that there was a reasonable basis to believe Sacirbey was guilty of the charged offense. The District Court listed the evidence against Sacirbey:

> (i) there were significant shortfalls in the [U.N.] Mission's account, over which Sacirbey had signature authority; (ii) Sacirbey refused to explain certain non-routine expenditures to Ministry representatives, even though [Bosnian] procedures do not allow for confidential expenditures; (iii) President Izetbegovic expressly denied that Sacirbey had been authorized to spend [Bosnian] funds on the ICJ and ICTY cases; (iv) Sacirbey represented that he would be able to

13

restore some of the missing funds, but then failed to do so; (v) he may have evaded the efforts of [Bosnian] authorities to question him about the accounting problems; and (vi) he failed to account properly for personal advances that he had taken against the Mission account.

*Id.* at \*38-39. In the District Court's judgment, "[t]his evidence clearly support[ed] [Magistrate] Judge Maas's determination that a finder of fact reasonably could conclude that Sacirbey embezzled funds from the Mission account and used them for his own personal needs." *Id.* at \*39 (internal quotation marks omitted).

The District Court also rejected Sacirbey's constitutional challenges to the adequacy of the proceedings before Magistrate Judge Maas. First, Sacirbey argued that the government's refusal to produce evidence relating to the role of United States officials in preparing or pursuing the extradition request violated *Brady v. Maryland*, 373 U.S. 83 (1963). The District Court disagreed, explaining that "[e]ven if *Brady* can be said to apply in the extradition context . . . *Brady* would not extend to Sacirbey's discovery requests . . . because Sacirbey's requests were directed not at *exculpatory* evidence, but rather information regarding the political motivations, if any, behind [Bosnia's] request for his extradition." *Sacirbey II*, 2006 U.S. Dist. LEXIS 64577, at \*44 (emphasis in original). Second, Sacirbey challenged Magistrate Judge Maas's refusal to reopen the extradition hearing to allow the submission of a reply declaration in response to an expert declaration submitted by the government. The District Court rejected the challenge because Sacirbey failed to show prejudice. *Id.* at \*45-46. Third, Sacirbey urged the District Court to consider the danger and deprivation of due process he would face if extradited to Bosnia. Citing the "well-entrenched rule of non-inquiry" into the legal procedures of a country requesting extradition pursuant to a treaty, the District Court did not entertain this challenge. *Id.* at \*47; *see Ahmad v. Wigen*, 910 F.2d 1063, 1066 (2d Cir. 1990) ("A consideration of the procedures that will or may occur in the requesting country is not within the purview of a habeas corpus judge.").

14

Having made these determinations, the District Court denied Sacribey's habeas corpus petition. This appeal followed.

**DISCUSSION**

On appeal, Sacirbey reiterates the arguments that he presented to the District Court, including that he was not charged with an extraditable offense under the Treaty. This argument presents a question of first impression for our Court, requiring us to examine a relatively undeveloped area of law.[14]

**A.    Standard of Review**

The basis for Sacirbey's petition for habeas corpus is that, by means of the extradition proceedings against him in the United States District Court for the Southern District of New York, he has been placed "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Our review of the denial of a petition for habeas corpus in extradition proceedings is "narrow" in scope. *Murphy v. United States*, 199 F.3d 599, 601 (2d Cir. 1999). A reviewing court can consider only three issues: "(1) whether the judge below had jurisdiction; (2) whether the offense charged is extraditable under the relevant treaty; and (3) whether the evidence presented by the Government established probable cause to extradite." *Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000); *see also Fernandez*, 268 U.S. at 312.

We are not at liberty to second guess the determination of the magistrate judge to issue an order certifying a request for extradition. Under our precedents, "[h]abeas corpus is not a writ of error, and it is not a means of rehearing what the [extradition] judge or magistrate already has decided." *Ahmad*, 910

---

[14] Our efforts in this regard are aided by the thorough and well-reasoned opinions of the judges who have previously considered this matter. That our conclusion differs from theirs should not be read to disparage in any way whatsoever the conscientious handling of this case by the District Court.

F.2d at 1066; *accord Garcia-Guillern v. United States*, 450 F.2d 1189, 1192-93 (5th Cir. 1971) ("A writ of habeas corpus cannot be used to hear for a second time the findings of the court which conducted the initial hearing. As has been said often, habeas corpus cannot take the place of a writ of error.").

It is nevertheless "our duty . . . to ensur[e] that the applicable provisions of the treaty and the governing American statutes are complied with." *Petrushansky v. Marasco*, 325 F.2d 562, 565 (2d Cir. 1963) (Marshall, *J.*); *see also Murphy*, 199 F.3d at 601-02 ("The function of habeas review in this context is to test only the legality of the extradition proceedings." (internal quotation marks omitted)).

With these principles in mind, we review the factual findings of the District Court for clear error and its legal determinations *de novo*. *See Drake v. Portuondo*, 553 F.3d 230, 239 (2d Cir. 2009) (providing the general standard for review of habeas corpus petitions); *cf. Armstrong v. Guccione*, 470 F.3d 89, 96 (2d Cir. 2006) (reviewing *de novo* a petitioner's legal arguments—raised under 28 U.S.C. § 2241—that his confinement for civil contempt violated the Fifth Amendment and several federal statutes).

**B.      Sacirbey Was Not Charged with an Extraditable Offense under the Treaty.**

Sacirbey argues that he has not been "charged" with an extraditable offense pursuant to the terms of the Treaty.[15] On Sacirbey's reading of the record, the evidence shows that an investigative warrant for his arrest was issued in 2001, but the issuing court was subsequently dissolved, with the consequence that "no [c]ourt in Bosnia is *currently* seized of the matter." Appellant's Br. 24 (emphasis in original). In Sacirbey's view, the putative interest that Bosnia asserted in correspondence cannot remedy the inadequacy of the warrant that underlies Bosnia's extradition request. The government responds that the Treaty "does not condition extradition on formal charges," and "all that need be

---

[15] Because we conclude that Sacirbey's argument on this point has merit, we do not consider the other grounds for relief raised in his petition.

16

shown is that the requesting nation intends to prosecute the extraditee." Appellees' Br. 34-35. Under the government's reading of the record, "Bosnia has repeatedly and unambiguously" indicated its intention to prosecute Sacirbey. *Id.* at 35. As noted above, the District Court agreed with the government's view of the evidence. Relying on non-binding precedents construing similar language in other treaties, the District Court observed that "[t]he term 'charge,' in this context, has been interpreted by courts to require something less than a formal charge: for example, the requirement has been deemed satisfied where a subject is 'accused,' or the requesting nation 'intend[s] to prosecute' him." *Sacirbey II*, 2006 U.S. Dist. LEXIS 64577, at *21 (internal citations omitted).

In one of the cases on which the District Court relied, *Assarsson I*, the petitioner argued that because "a formal document, called a 'charge' in the Swedish criminal code, . . . ha[d] not yet been filed against him, he [could not] be extradited." 635 F.2d at 1239. The Seventh Circuit rejected this argument on the grounds that (1) "[t]he filing of formal charges is not stated anywhere [in the treaty] as a prerequisite to extradition," *id.* at 1242; and (2) U.S. courts are not empowered to "review compliance with foreign criminal procedure" in the course of ordering extradition pursuant to a valid treaty, *id.* at 1244. The Eighth Circuit reached the same conclusion in a case involving the brother of the petitioner in *Assarsson I. In re Assarsson*, 687 F.2d 1157 (8th Cir. 1982) ("*Assarsson II*"). The Eighth Circuit adopted the Seventh Circuit's holding that, where "[t]he filing of formal charges is not stated anywhere as a prerequisite to extradition . . . , we may not review the magistrate's determination that [the extraditee] was charged under the terms of the treaty." *Assarsson II*, 687 F.2d at 1160 (quoting *Assarsson I*, 635 F.2d 1242).

The government informs us that the reasoning of *Assarsson I* and *Assarsson II*, has been adopted by the Ninth Circuit as well. Appellees' Br. 35; *see Emami v. U.S. Dist. Court for the N. Dist. of Cal.*, 834 F.2d 1444, 1448-49 (9th Cir. 1987). Like the Seventh and Eighth Circuits, the Ninth Circuit determined

17

that, where an extradition treaty does not condition extradition on the filing of formal charges, it would not read such a requirement into the treaty. That court explained, "We refrain from interpreting the requirements of German criminal procedure [with respect to the filing of a public charge] both out of respect for German sovereignty and because we recognize the chance of erroneous interpretation is much greater when we try to construe the law of a country whose legal system is not based on common law principles." *Id.* at 1449.[16]

Similar "formal-charge" arguments have been rejected by other courts, including district courts in this Circuit. These courts have also addressed the question of how to establish that a crime has been "charged" for the purposes of an extradition treaty, holding that a demonstrated intent to prosecute on the part of the country requesting extradition is sufficient. *See Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 130 (E.D.N.Y. 2001) ("American courts cannot become enmeshed in the technicalities of foreign criminal processes, and . . . the 'charge' requirement is satisfied by a requesting *nation's intent to prosecute as evidenced by the record.*" (emphasis added)); *In re La Salvia*, No. 84 Cr. Misc. 1, 1986 U.S. Dist. LEXIS 29789, at *16-17 (S.D.N.Y. Jan. 31, 1986) ("[T]he reference to 'persons . . . charged' in [the treaty] . . . is a generic term referring to those persons whose extradition is sought *so that they may be brought to trial.*"

_____

[16] The government also relies on the conclusory statement of the Fifth Circuit that "[the] contention that [extraditee] has never been properly or legally charged with a crime in accordance with the treaty is . . . not appropriate for consideration [on habeas review]." *Garcia-Guillern*, 450 F.2d at 1193 n.1. This statement is at odds with the determinations of the Seventh, Eighth and Ninth Circuits that they have jurisdiction to consider this question on habeas review. *See Emami*, 834 F.2d at 1448 ("Whether a treaty conditions extradition upon the filing of formal charges is a question cognizable on appeal from the denial of a petition for habeas corpus."); *Assarsson II*, 687 F.2d at 1160 ("'The existence of formal charges can be reviewable, then, only if the treaty itself conditions extradition for the offenses listed . . . on the existence of formal charges.'" (quoting *Assarsson I*, 635 F.2d at 1241)). We note that the Fifth Circuit's statement is broader than the government's position, which is that the status of the charges against Sacirbey are not reviewable on a habeas corpus petition *because* the Treaty does not require formal charges as a condition of extradition. *See* Appellees' Br. 38 ("[The Treaty] does not require as a condition of extradition that an extraditee be formally charged. Accordingly, Sacirbey's arguments regarding the status of his charges in Bosnia are beyond the purview of habeas review.").

18

(emphasis added)); *cf. In re Extradition of Lehming*, 951 F. Supp. 505, 512 (D. Del. 1996) ("[S]ufficient *evidence of an intent to prosecute* exists making extradition proper under these circumstances.") (emphasis added).

The government interprets these precedents to stand for the following proposition: When extradition treaties state that an individual must be "charged" with a crime in order to be extradited, but do not require the filing of an accusatory instrument, a state seeking extradition need show only an intent to prosecute the individual in order to satisfy the requirement that he be "charged" with a crime. This proposition appears reasonable insofar as it gives meaning to treaty language stating that an individual must be "charged" with an offense in order to be extradited, while avoiding unwarranted incursions into the fine details of foreign criminal procedure. *See, e.g.*, *Jhirad v. Ferrandina*, 536 F.2d 478, 484-85 (2d Cir. 1976) (" It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation. Such an assumption would directly conflict with the principle of comity upon which extradition is based."). Applying that teaching to this case, the government urges us to conclude that, because the Treaty requires that an individual be "charged" with a crime but does not require that formal charges be brought, a "clear intent" to prosecute is sufficient to satisfy the terms of the Treaty. Appellees' Br. 44.

Sacirbey responds that one additional proposition follows from the cases cited by the District Court and the government—"that there at least be a judicial body in the requesting state seized of the matter, to which the extraditee can petition for relief." Appellant's Reply Br. 8. Sacirbey observes that, in all of these cases, an "instituted judicial proceeding," *id.* was underway in the requesting country. *See Emami*, 834 F.2d at 1447 (Bochum Local Court in Germany); *Assarsson II*, 687 F.2d at 1158 (Malmo District Court in Sweden); *Assarsson I*, 635 F.2d at 1239 (Malmo District Court in Sweden); *Borodin*, 136 F. Supp. 2d at 127 (proceedings before a Swiss Examining Magistrate); *In re Extradition of Lehming*, 951

19

F. Supp. at 508 (Saarbrucken District Court in Germany); *In re La Salvia*, 1986 U.S. Dist. LEXIS 29789, at *21 (Federal Court of First Instance in Penal and Correctional Matters in Argentina). Based on this observation, Sacirbey argues that the Treaty should be read to require a showing of "[t]he presence of a judicial authority conducting proceedings toward prosecution of the potential extraditee." Appellant's Br. 23. In the absence of such a requirement, Sacirbey fears that "an extraditee may . . . be handed over to political officers of a foreign country for arbitrary and potentially brutal prosecution." *Id.* at 24. He urges us to conclude that, "because no existing [c]ourt has issued a warrant for his arrest or assumed responsibility for his prosecution or protection," he has not been "charged" with a crime under the Treaty. Appellant's Reply Br. 11.

We appreciate the force of Sacirbey's concerns. Indeed, he may be right that extradition treaties *should* contain provisions ensuring that a judicial body in the requesting country stand ready to ensure procedural regularity upon the transfer of custody over the accused. Whether or not the United States should condition extradition—particularly the extradition of its own citizens—on such safeguards is not, however, a question over which this Court has jurisdiction. "[T]he question of the wisdom of extradition remains for the executive branch to decide." *Murphy*, 199 F.3d at 602 (internal quotation marks omitted). Our power, by contrast, is "limited to ensuring that the applicable provisions of the treaty and the governing American statutes are complied with." *Petrushansky*, 325 F.2d at 565.

In keeping with that limited authority, we examine the requirements of the extradition treaty in this case. "In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." *United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992); *see also Kahn Lucas Lancaster v. Lark Int'l*, 186 F.3d 210, 215 (2d Cir. 1999) ("Treaties are construed in much the same manner as statutes[,] [and their interpretation] must account for the . . . full text, language as well as punctuation, structure and subject matter." (internal citations and quotation marks omitted)). A basic canon of statutory

20

interpretation, which is equally applicable to interpreting treaties, is to avoid readings that "render statutory language surplusage" or "redundant." *Filler v. Hanvit Bank*, 378 F.3d 213, 220 (2d Cir. 2004); *cf.* Restatement (Second) of Contracts § 203(a) (1981) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."). In addition, we have observed that "the meaning of one term may be determined by reference to the terms it is associated with, and that where specific words follow a general word, the specific words restrict application of the general term to things that are similar to those enumerated." *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 401 (2d Cir. 2008) (brackets and internal quotation marks omitted); *cf.* Restatement (Second) of Contracts § 203(c) (1981) ("[S]pecific terms and exact terms are given greater weight than general language.").

In the instant case, our review focuses on "whether the offense *charged* is extraditable under the relevant treaty." *Cheung*, 213 F.3d at 88 (emphasis added). Article I of the Treaty sets forth a foundational principle that the states parties "mutually agree to deliver up persons who[ ] hav[e] been *charged* with or convicted of any of the crimes and offenses" (emphasis added), which are supplied in Article II. The remaining articles of the Treaty define the contours of the broad agreement in Article I, including certain limitations on the breadth of the term "charged." Most important to the instant case, Article III of the Treaty imposes a requirement that when "[a] fugitive is merely *charged* with crime, *a duly authenticated copy of the warrant of arrest in the country where the crime has been committed, and of the depositions or other evidence upon which such warrant was issued,* shall be produced."[17] Treaty art. III (emphases added). In other words, the "warrant of arrest" is a formal legal instrument that is required by the Treaty to show that a person has been charged with an extraditable crime. *See* art. IV (describing the Article III

---

[17] Articles V and VI of the Treaty provide additional limitations on Article I's general extradition agreement for a country's own citizens, *id.* at art. V, and for people accused of political crimes, *id.* at art. VI.

warrant requirement as a "presentation of *formal* proofs" (emphasis added)). Accordingly, we interpret

these provisions to mean that the proof required under the Treaty to establish that an individual has

been "charged" with a crime is a valid arrest warrant and the evidence submitted in order to obtain that

warrant. Any other reading would ignore the express terms of Article III. *Cf. Filler*, 378 F.3d at 220

(stating that courts should avoid readings that "render statutory language surplusage").

Under this construction of the Treaty, Bosnia can satisfy the requirement that Sacirbey be

"charged" with a crime only if it can provide, *inter alia*, a valid warrant for his arrest. Bosnia seeks the

extradition of Sacirbey pursuant to an "international arrest warrant" issued by the Cantonal Court in

Sarajevo. However, as the District Court found, the Cantonal Court currently lacks jurisdiction over

the investigation of Sacirbey's alleged crimes and "no longer ha[s] any power to enforce" the arrest

warrant. *Sacirbey*, 2006 U.S. Dist. LEXIS 64577, at *23 n.12.[18] Such a warrant—one issued by a court

lacking jurisdiction to enforce it—has been described in another context by the Supreme Court as a

"dead letter." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274 (1990) (rejecting an argument that a

warrant issued by a magistrate in the United States would have force in Mexico); *see also In re Terrorist

Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157, 171 n.8 (2d Cir. 2008) (describing the power

conferred by a *valid* search warrant). The arrest warrant for Sacirbey was never re-issued—or otherwise

ratified—by a Bosnian court with jurisdiction over this case.[19] Accordingly, the existence of this arrest

---

[18] The government does not argue that the District Court's findings of fact on the jurisdiction of the Cantonal Court are erroneous, much less clearly erroneous, nor does our review of the record lead us to question the District Court's determination.

[19] In her dissent, Judge Kearse argues that the original warrant for Sacirbey's arrest was transferred to the National Court. However, she provides no evidence or citations to the record that would support this interpretation. Even assuming *arguendo* that Sacirbey's case was transferred, there is no indication that the Bosnia National Court re-issued, ratified, or acknowledged in any fashion the arrest warrant.

warrant—issued by a court ousted of jurisdiction and no longer able to enforce it—cannot satisfy the Treaty's requirement that Bosnia demonstrate a "charge" by producing a valid arrest warrant.

Consistent with its interpretation of the precedents discussed above, the government maintains that the defect in Bosnia's application can be remedied by official statements indicating Bosnia's intent to prosecute Sacirbey for his alleged crimes. The government points to letters from various Bosnian officials that allegedly show an intention to prosecute Sacirbey, but proof of such an intention is not what the Treaty requires.[20] Even if it did, these letters are equivocal, at best, on the question of whether Bosnian authorities intend to prosecute Sacirbey for his alleged crimes. The letter dated October 2, 2003 from Assistant United States Attorney E. Danya Perry to Magistrate Judge Mass states: "[T]he Cantonal Prosecutor, Mustafa Bisic, confirmed that there is an ongoing criminal investigation against Sacirbey" and that the Bosnian government sought extradition to further that investigation. J.A 383. The virtually illegible attachment to the October 2 letter also refers to an "investigation against Sacirbey" but does not indicate an intention to prosecute, rather than merely investigate, him. *Id.* at 385.

The letters from Amra Kosovic, Counselor to the Bosnian Embassy in Washington DC, similarly confirm only that Sacirbey is under investigation in Bosnia, not that the Bosnian government seeks to prosecute him. Her letter of October 11, 2005 states ambiguously that "the Court of Bosnia and Herzegovina will proceed in the Matter of Mohamed Sacirbegovic if the request for extradition would be approved." *Id.* at 960. This statement does not hint at *how* the Bosnian court will proceed—that is, whether by immediate prosecution or by permitting the prosecutor to undertake further investigation. Kosovic's letter of November 10, 2005 does nothing to clarify the matter. In

---

[20] We take no position on what showing is required when an extradition treaty does not provide any indication of how a requesting state must show that an accused has been "charged" with a crime.

23

that letter, she states that the "Cantonal Court—the one that issued the warrant and demand for investigation of Mr. Muhamed Sacirbegovic—was [not] abolished by the justice system reforms," and she confirms that the "Court exists and hears all cases that are within its jurisdiction." J.A 961. Of course, we know that Sacirbey's case is no longer within that court's jurisdiction pursuant to Bosnia's judicial reforms. *Sacirbey*, 2006 U.S. Dist. LEXIS 64577, at *23 n.12. Perhaps recognizing this fact, the letter notes that "the Court of Bosnia and Herzegovina was established and . . . *can, on request of the parties in a case, decide to hear this case* of extradition." J.A. 961 (emphasis added). Contradicting this conditional statement regarding the Bosnian court's jurisdiction, Kosovic reiterates, verbatim from her earlier letter, that "[t]he Court of Bosnia and Herzegovina *will proceed* in the Matter of Mohamed Sacirbegovic if the request for extradition would be approved." *Id.* (emphasis added). In addition, she observes that the "Prosecutor's office of Bosnia and Herzegovina . . . took the investigation which was previously held by the Prosecutor's Office of the Canton Sarajevo." *Id.* Again, the letter is devoid of any statement that Sacirbey is sought for prosecution in Bosnia.[21]

That nothing more than a criminal investigation of Sacirbey is now pending in Bosnia finds further support in a letter, dated March 3, 2005, from the Cantonal Court in Sarajevo stating that "no indictment against [Sacirbey] . . . has been brought before the Municipal Court Sarajevo or the Cantonal Court in Sarajevo." *Id.* at 749. This letter states that the "criminal investigation against [him] . . . was

---

[21]In her dissenting opinion, Judge Kearse asserts that "will proceed" reflects an active intent to prosecute by the Bosnian government—a contention for which she provides no supporting authority. Although her interpretation is one feasible reading, the letters are ambiguous. It is that ambiguity which makes us unable to derive from them an active intent to prosecute.

Judge Kearse argues further that we cannot overturn the District Court's "factual finding" as to the meaning of the letters unless that finding is clearly erroneous. We do not base our decision on the meaning of the letters, however, and offer our interpretation of the letters only in response to the argument that an "intent to prosecute" is present. As a matter of law, we hold only that the Treaty requires a valid arrest warrant; there is no valid warrant in the present case; and the terms of the Treaty were, accordingly, not met. Whether an intent to prosecute can be proven by the letters is therefore irrelevant to our holding.

24

referred to the Cantonal Prosecutor's Office Sarajevo on 08/06/2003 for appropriate action." *Id.* While formal charges are not required to grant an extradition request, this letter corroborates that an investigation of Sacirbey *in the prosecutor's office*—rather than a prosecution in court[22]—is pending in Bosnia. Based on our review of this evidence, we are dubious that Bosnia seeks to prosecute Sacirbey for a crime.[23]

In any event, whether Bosnia has "intent to prosecute" Sacirbey is not the relevant inquiry. As explained above, the Treaty requires a valid arrest warrant as proof that an individual sought for extradition has been charged with a crime. That requirement is not satisfied by a demonstration of intent to prosecute. The necessary showing has not been made in this case. All of the "formal charges" cases cited by the government indicate the existence of a valid arrest warrant issued by a foreign tribunal. *See Emami*, 834 F.2d at 1447 (arrest warrant issued by a German court); *Assarsson II*, 687 F.2d at 1158 (arrest declaration issued by Swedish court); *Assarsson I*, 635 F.2d at 1239 (arrest declaration issued by Swedish court); *Borodin*, 136 F. Supp. 2d at 127 (arrest warrant issued by Swiss magistrate); *In re Extradition of Lehming*, 951 F. Supp. at 508 (arrest warrant issued by a German court); *In re La Salvia*, 1986 U.S. Dist. LEXIS 29789, at *21 (arrest warrant issued by Argentine court). None of those cases involve a situation where the issuing tribunal subsequently lost jurisdiction over the case

---

[22] Judge Kearse relies on Bosnia's Criminal Procedure Code to support her argument and also to infer the functions and the jurisdictional reach of the National Court. However, she provides no indication, through Bosnian precedent or otherwise, that Bosnian courts would interpret the code provisions in the way that she has chosen to interpret them, and her position is contradicted by the evidence actually in the record: the Cantonal Court was dissolved; no Bosnian authority has provided a *clear* statement as to whether there is a prosecution now pending in a Bosnian court; and Bosnian authorities have issued only ambiguous letters regarding the status of Sacirbey's case.

[23] As described *ante*, the District Court reached the opposite conclusion, *see Sacirbey*, 2006 U.S. Dist. LEXIS 64577, at *23 ("The letters plainly indicate a present intent to prosecute Sacirbey in the National Court."), but we need not decide whether this ruling was erroneous because it is irrelevant to Sacirbey's extradition.

25

owing to a constitutional reorganization, regime change, or any other reason, such that the arrest warrant was no longer valid.

Because the record contains no evidence of a valid warrant authorizing the arrest of Sacirbey, Sacirbey has not been charged with an extraditable offense pursuant to the terms of the Treaty. This defect falls within the narrow category of issues that is cognizable on habeas review of an extradition order, *see Cheung*, 213 F.3d at 88, and we therefore grant Sacirbey's petition for a writ of habeas corpus.

**CONCLUSION**

For the reasons stated above, we conclude that Sacirbey has not been "charged" with an extraditable offense pursuant to the terms of the extradition treaty between the United States and Bosnia. He is therefore entitled to habeas relief.

We also note, in passing, that, if Bosnia renews its request to extradite Sacirbey, the Department of State is authorized by the extradition treaty and by statute to refrain from extraditing Sacirbey because he is a citizen of the United States. An exercise of that discretion might be warranted if Bosnia renews its extradition request and the Department of State determines that the investigation into Sacirbey's tenure as United Nations Ambassador is motivated by a political vendetta, or that Sacirbey faces mistreatment if he is delivered into Bosnian custody, or for any of the other grounds available to the Department to decline extradition—or, indeed, for no reason at all, as the Treaty does not require any justification for declining to extradite U.S. citizens. *See* Treaty for Mutual Extradition of Fugitives from Justice, U.S.-Serb., art. V, Mar. 7, 1902 (date of ratification by the President), 32 Stat. 1890, 12 Bevans 1238 ("Neither of the high contracting parties shall be bound to deliver up its own citizens or subjects under the stipulations of this Treaty."). That determination rests, of course, with the Executive Branch of Government, not the Judiciary.

Accordingly, the order of the District Court denying the petition is **REVERSED**, and Sacirbey's petition for a writ of habeas corpus is hereby **GRANTED**. The restrictions imposed on Sacirbey's liberty are **VACATED** and he shall not be extradited to Bosnia pursuant to the formal requests that have been made.

It is so ordered.

KEARSE, <u>Circuit Judge</u>, dissenting:

I respectfully dissent from the majority's decision to overturn the district court's denial of the habeas corpus petition of Muhamed Sacirbey, which sought to forbid his extradition from the United States to the republic of Bosnia and Herzegovina (hereinafter generally "Bosnia"). Extradition was requested by Bosnia in 2002 on the ground that Sacirbey, while serving as its ambassador to the United Nations, abused his official position by misappropriating $610,982.46 in official Bosnian funds to his own private account. There is no dispute that embezzlement by a public official is a criminal offense for which a person who is so "charged" or "convicted" may be extradited pursuant to the treaty between Bosnia, as a successor to the Kingdom of Serbia, and the United States, <u>see</u> Treaty for the Mutual Extradition of Fugitives from Justice, U.S.-Serb., art. I, Oct. 25, 1901, 32 Stat. 1890 ("Treaty") (the parties "mutually agree to deliver up persons who[ have] been charged with or convicted of any of the crimes and offenses specified in the following article"); <u>id</u>. art. II, para. 6 ("Extradition shall be granted for . . . . Embezzlement by public officers"). Nor do Sacirbey and the majority appear to suggest that it is not within the competence and authority of the Court of Bosnia and Herzegovina (the "National Court" or "Court") to adjudicate such a charge of embezzlement; and the majority

recognizes that under the Treaty, "formal charges are not required to grant an extradition request," Majority Opinion ante at 25.

The majority, however, concludes that Sacirbey is not "charged" with embezzlement--or any crime--because the majority finds (a) that "the arrest warrant at issue in this case was issued by a court that neither has jurisdiction over the matter nor authority to enforce the warrant," Majority Opinion ante at 2, and that a warrant "issued by a court lacking jurisdiction to enforce it" is a nullity, id. at 22-23; and (b) that the representation by Bosnia's "Ministry of Justice" that the "Court of Bosnia and Herzegovina will proceed in the Matter of Muhamed Sacirbe[y]" (Letters from Amra Kosovic, Counselor in the Embassy of Bosnia and Herzegovina in Washington, D.C., to the United States Department of State and the United States Department of Justice dated October 11, 2005 ("October 2005 Bosnian Embassy Letter"), and November 10, 2005 ("November 2005 Bosnian Embassy Letter") (collectively the "2005 Bosnian Embassy Letters")), leaves the majority "dubious that Bosnia seeks to prosecute Sacirbey for a crime," id. at 25 (emphasis added), because, the majority says, "[t]his statement does not hint at how the Bosnian court will proceed--that is whether by immediate prosecution or by permitting the prosecutor to undertake further investigation," id. at 24 (emphasis in original). I disagree with the majority's rationales. I discuss them in reverse order.

(1) The Notion that the Bosnian Court Intends Merely To Permit Investigation

The majority's speculation that the Bosnian National Court may intend merely to permit further investigation of Sacirbey, rather than to entertain his prosecution, is belied by the course of the prior proceedings in Bosnia and by the provisions of the Criminal Procedure Code of Bosnia and Herzegovina ("Bosnia CPC" or "CPC"), adopted in 2003 as part of nationwide judicial reforms. In 2001, Bosnia operated under a civil-law system in which investigations of possible criminal acts were conducted by regional courts in Bosnia's Cantons. In April 2001, the Sarajevo Cantonal prosecutor's office asked the Sarajevo Cantonal Court to investigate allegations that Sacirbey had abused his official position by misappropriating public funds. In August 2001, the Cantonal Court issued a "DECISION TO INVESTIGATE" Sacirbey, based on "a well-founded suspicion" that during his tenure as Bosnia's ambassador to the United Nations, Sacirbey abused his official position by, _inter alia_, transferring various specified sums of Bosnian United Nations mission money, totaling $610,982.46, to his own private accounts. In December 2001, the Cantonal Court issued a "DECISION FOR DETENTION" and a warrant for the arrest of Sacirbey, "the former Ambassador of [Bosnia] at the Permanent Mission of [Bosnia] with the UN," "because there is a well-founded suspicion that [he] committed the criminal act of abuse of official position or authority." In January 2002, Bosnia submitted to the United States a request for Sacirbey's extradition.

- 3 -

In 2003, Bosnia converted from the civil-law system to a common-law system, and investigative functions that had been vested in the courts were transferred to independent prosecutors. In August 2003, the Sarajevo Cantonal Court transferred the Sacirbey matter to the Sarajevo Cantonal Prosecutor's office for appropriate action. The Bosnian court reforms also included the establishment of the National Court, which serves functions similar to those of the federal courts in the United States. Because Sacirbey was alleged to have abused his position as a representative of the Bosnian nation, the Sacirbey investigation, which had been transferred by the Sarajevo Cantonal Court to the Sarajevo Cantonal Prosecutor, was then transferred from the Cantonal Prosecutor to the office of the National Prosecutor.

The majority's notion that the Bosnian Ministry of Justice's representation that the Bosnian National Court "will proceed" in Sacirbey's case (2005 Bosnian Embassy Letters) means that the Court may merely conduct or "permit[]" "further investigation," Majority Opinion ante at 24, is belied by the facts that, pursuant to Bosnia's judicial reforms, the investigation of Sacirbey had already been transferred from court to independent prosecutor, and under the Bosnia CPC, adopted in 2003 as part of the judicial reforms, the Court plays no role in investigations. The provisions of the CPC "set forth the rules of the criminal procedure that are mandatory for the proceedings of the [National] Court" and the conduct of criminal matters by the National Prosecutor. Bosnia CPC art. 1. Under the CPC, "[t]he

- 4 -

term 'investigation' refers to all activities," including collection and preservation of information and evidence, "undertaken by the Prosecutor or by authorized officials in accordance with this Code," id. art. 20(j). "[A]uthorized official[s]" are defined as various law enforcement personnel such as members of the "State Border Service," "military police," and "Police bodies of the responsible ministries of" the Bosnian regions, id. art. 20(g); those officials are supervised by the Prosecutor, see id. art. 218. All of the "INVESTIGATIVE PROCEDURE[S]" set forth in the CPC describe powers and duties of "the Prosecutor" and the officials he or she supervises. See id. art. 213-225. There are no CPC provisions placing investigative functions, or the supervision of such functions, in the courts. The investigative procedures section of the CPC begins by stating that public officials are "bound to," and private citizens "are entitled to," report the commission of a criminal offense, id. art. 213(1), 214(1), and that "[t]he report must be filed with the Prosecutor," id. art. 215(1) (emphasis added). Further clarifying that investigations are within the sole province of the Prosecutor, not the Court, the CPC provides that

> [i]f the report [of suspected criminal conduct] is filed with the Court, authorized official or some other court or prosecutor in Bosnia and Herzegovina, they shall accept the report and shall immediately submit the report to the Prosecutor.

Id. art. 215(3) (emphasis added). There is no provision giving the Court authority to say whether or not an investigation may be pursued.

- 5 -

I thus see no principled reason to infer that the Bosnian Ministry of Justice's statement that the National Court "will proceed" in Sacirbey's case means that the Court may merely "permit[] the prosecutor to undertake further investigation," Majority Opinion ante at 24. And surely it disserves the interests of international comity for a court of the United States to forbid extradition on the basis of a mere suspicion that the National Court of the requesting nation intends to proceed in a manner not authorized by that nation's criminal procedure code.

In contrast to the dubiety expressed here by the majority, the district court found that "the evidence," including the 2005 Bosnian Embassy Letters, "demonstrates that [Bosnia] intends to prosecute Sacirbey for the offense of abuse of authority." Sacirbey v. Guccione, No. 05 CV 2949, 2006 WL 2585561, at *7 (S.D.N.Y. Sept. 7, 2006); see also id. ("The letters plainly indicate a present intent to prosecute Sacirbey in the National Court. While the effectuation of that intent is conditioned on Sacirbey's extradition, the intent nevertheless presently exists." (emphasis in original)). I cannot view the district court's finding that Bosnia intends to prosecute Sacirbey as clearly erroneous. It is supported not only by the 2005 Bosnian Embassy Letters, but also by (a) the fact that the Sacirbey matter, including the Sarajevo Cantonal Court's finding of a well-founded suspicion that Sacirbey misappropriated $610,982.46 in Bosnian funds, was transferred to the office of the National Prosecutor, and (b) the CPC provision that "if there is evidence

- 6 -

that a criminal offense has been committed," the National Prosecutor, unless otherwise stated by the CPC, "is obligated to initiate a prosecution," Bosnia CPC art. 17 (emphasis added).

(2)   The Majority's View that the Arrest Warrant is a Nullity

The majority also reasons that, although the Sarajevo Cantonal Court issued a warrant for Sacirbey's arrest in 2001, the fact that that court no longer has jurisdiction to enforce the warrant makes the warrant a "'dead letter,'" Majority Opinion ante at 23, quoting United States v. Verdugo-Urquidez, 494 U.S. 259 (1990)--an opinion that observed that a warrant issued by a magistrate in the United States would have no force "outside the United States," id. at 274. I do not see the applicability of that observation--as to a warrant's potential extraterritorial effect--to the circumstances here, which involve changes in institutional functions resulting from court reforms within a single country.

Further, the majority apparently assumes that the Bosnian court reforms automatically divested the Sarajevo Cantonal Court of jurisdiction to entertain a prosecution of Sacirbey and assumes that a loss of jurisdiction in the Cantonal Court means that no court has jurisdiction. In my view, neither assumption is correct. Although I agree that the Sarajevo Cantonal Court no longer has jurisdiction, it appears to me, given the provisions of the Bosnia CPC, that the divesture of jurisdiction was not automatic but instead results from the decision of the Bosnian

National Court to take the case. I see no reason--and the majority does not explain--why a nation's court reforms cannot entail the transfer of cases from one court to another; and it appears that the Bosnia reforms envision the retention of jurisdiction by the Cantonal Courts in some cases and the transfer to the National Court of other cases of which the National Court wishes to take jurisdiction. The CPC provides that

> [c]ases falling within the competence of the [National] Court <u>which are pending before other courts or prosecutor's offices and in which the indictment is not legally effective or confirmed</u>, shall be finalized <u>by these courts **unless**</u> the [National] Court, <u>ex officio</u> **or** upon the reasoned proposal of the parties or defense attorney, decide to take such a case.

CPC art. 449(2) (emphases added). I read "shall be finalized by these courts" to mean that even the Sarajevo Cantonal Court could have proceeded to adjudicate Sacirbey's case if the National Court had not decided to take the case. And I read the "unless the Court <u>ex officio</u>" clause to mean that the National Court is entitled, simply by virtue of being the National Court, to take jurisdiction of the case. This interpretation is consistent with that of the Bosnian Ministry of Justice, which is Bosnia's "central co-ordinating body for ensuring inter-Entity legislative and justice system harmony and best practice," Law on Ministries and Other Bodies of Administration of Bosnia and Herzegovina, art. 13. The Ministry of Justice is identified in the November 2005 Bosnian Embassy Letter as the source of the information (a) that the National Court can hear Sacirbey's case pursuant to CPC art. 449(2), and (b) that if the United States grants extradition

- 8 -

of Sacirbey, the National Court "will proceed." Thus, while I agree with the majority that the Sarajevo Cantonal Court no longer has the power to proceed in the matter of Sacirbey, I reach that conclusion because the Bosnia National Court has decided to take the case. I do not agree with the majority that extradition should be denied on the theory that, rather than having been transferred to the National Court, the original warrant for Sacirbey's arrest has become a "dead letter," Majority Opinion ante at 23 (internal quotation marks omitted).

(3)  Replies to the Majority's Objections to this Dissent

In response to this dissent, the majority makes several assertions that I find untenable and/or unpersuasive. For example, it asserts that "the Cantonal Court was dissolved," Majority Opinion ante at 25 n.22. That contention was advanced in the district court by Sacirbey, but it was explicitly contradicted by the Bosnian government:

> The Ministry of Justice of Bosnia and Herzegovina can not accept the statement that the Cantonal Court--the one that issued the warrant and demand for investigation of Mr. [Sacirbey]--was abolished by the justice system reforms. The mentioned Court exists and hears all cases that are within its jurisdiction.

November 2005 Bosnian Embassy Letter.

In addition, the majority states that "no Bosnian authority has provided a clear statement as to whether there is a prosecution now pending in a Bosnian court," Majority Opinion ante at 25 n.22 (first emphasis in original; second emphasis mine). I

- 9 -

cannot see that this provides a basis for requiring the district court to forbid extradition; the majority itself acknowledges that, under the Treaty, "formal charges are not required to grant an extradition request," id. at 25.

As to the majority's further suggestion that there is no evidence "that the original warrant for Sacirbey's arrest was transferred to the National Court," Majority Opinion ante at 23 n.19, I see nothing in the record to indicate that the arrest warrant was not transferred as part of the transfer of the case. Further, even if the warrant was not transferred, there is nothing in the record to indicate that the warrant is not still extant, given that--contrary to the majority's notion that "the Cantonal Court was dissolved," Majority Opinion ante at 25 n.22--the Bosnian Ministry of Justice says that the Cantonal Court was not abolished and still "exists" (November 2005 Bosnian Embassy Letter). I thus do not see the validity of the majority's holding that "there is no valid [arrest] warrant in the present case" "[a]s a matter of law," id. at 25 n.21.

Finally, the majority finds that Bosnia's representation that the Bosnia National Court "will proceed" is "ambiguous," Majority Opinion ante at 25 n.21, as the majority believes this may mean that that court will merely "permit[] the prosecutor to undertake further investigation," id. at 24, and "[i]t is that ambiguity which makes [the majority] unable to derive from the[ 2005 Bosnian Embassy Letters] an active intent to prosecute," id. at 25 n.21. I have three major difficulties with this aspect of

- 10 -

the majority opinion. First, as discussed above, I do not see any provision in the Bosnia CPC giving the National Court authority either to "permit[]" or to prohibit "investigation." Second, even linguistically, I cannot view "permit[] the prosecutor to undertake further investigation" as a plausible interpretation of the Bosnia Ministry of Justice's statement that the "Court of Bosnia and Herzegovina will proceed." Third, we are not factfinders; factfinding is the function of the district court. And when the district court has made a finding of fact-- here, that "[t]he letters plainly indicate a present intent to prosecute Sacirbey in the National Court," 2006 WL 2585561, at *7--we are not allowed to overturn that finding unless it is "clearly erroneous." Fed. R. Civ. P. 52(a)(6). A feeling that the evidence is "ambiguous," Majority Opinion ante at 25 n.21, does not meet the clearly-erroneous test--especially when the majority acknowledges that the judicial interpretation it questions "is one feasible reading," id.

In sum, Bosnia has sought the extradition of Sacirbey since January 2002, having issued in December 2001 a warrant for his arrest stating that there was good reason to suspect that, while he was a public official, Sacirbey embezzled Bosnian funds; the matter was thereafter, pursuant to Bosnia's judicial reforms, transferred to Bosnia's National Prosecutor, who has a statutory duty to prosecute where there is evidence that a criminal offense has been committed; and Bosnia's Ministry of Justice has stated that Sacirbey's case will be heard by Bosnia's National Court--a

tribunal to which Bosnia's reformed criminal procedure code gives no investigative powers but gives authority _ex officio_ to take his case. I thus see no error in the district court's finding that Bosnia intends to prosecute Sacirbey; and I dissent from the majority's decision to reverse on the basis of its speculation, contrary to the Bosnia CPC, that the Bosnian National Court may merely intend to permit further investigation, and of its view, contrary to my reading of CPC art. 449(2), that the warrant for Sacirbey's arrest died with the birth of the Bosnian court reforms.